Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523
Telephone:  775.525.8777
Facsimile:   775.501.5157

*Attorney for Plaintiff*
*CRANDALL TECHNOLOGIES LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRANDALL TECHNOLOGIES LLC, a Nevada limited liability company, | Case No. 20-cv-06220 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **PATENT INFRINGEMENT** |
| IRHYTHM TECHNOLOGIES, INC., a Delaware corporation, | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

///
///
///
///
///
///
///
///

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ……………………………......……….. 1

THE PARTIES ……………………………………………………….. 1

JURISDICTION ……………………………………………………... 1

VENUE ………………………..…………………………………….5

INTRADISTRICT ASSIGNMENT …………………………………. 6

PLAINTIFF'S ASSERTIONS AND STATEMENT OF THE CLAIM …..……. 6

    I.    Letters Patent and Standing. ………..…………………………… 6

    II.    Activities and Instrumentalities. ……………………………….... 7

    III.    Direct Infringement. ……………………………………… 30

        A.    Claim 1 …………………………………………… 31

        B.    Claim 2 …………………………………………… 36

        C.    Claim 3 …………………………………………… 38

        D.    Claim 4 …………………………………………… 39

        E.    Claim 5 …………………………………………… 41

        F.    Claim 8 …………………………………………… 44

        G.    Claim 9 …………………………………………… 47

        H.    Claim 13 …………………………………………… 48

        I.    Claim 16 …………………………………………… 50

        J.    Claim 17 …………………………………………… 52

    IV.    Induced Infringement. …………………………………… 55

    V.    Contributory Infringement. …………………………………… 61

    VI.    Additional Information. …………………………………… 62

    VII.    Remedies. …………………………………………… 63

DEMAND FOR JUDGMENT; PRAYER FOR RELIEF …..……………… 65

DEMAND FOR JURY TRIAL …..………………………………… 66

1.    Plaintiff Crandall Technologies LLC (hereinafter referred to as "Plaintiff"), for its Complaint for Patent Infringement against Defendant iRhythm Technologies, Inc. (hereinafter referred to as "Defendant"), alleges as follows:

### NATURE OF THE ACTION

2.    This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*

3.    Defendant has infringed and continues to infringe, has contributed to and continues to contribute to infringement of, and has induced and continues to induce infringement of, one or more claims of U.S. Patent No. 8,854,789 B2.[1]

4.    Plaintiff is the legal owner by assignment of U.S. Patent No. 8,854,789 B2, which was duly and legally issued by the United States Patent and Trademark Office (USPTO).

5.    Plaintiff seeks injunctive relief and monetary damages.

### THE PARTIES

6.    Plaintiff is a limited liability company organized under the laws of the State of Nevada and having its principal place of business at 1590 Heavenly View Trail, Reno, Nevada 89523.

7.    Upon information and belief, Defendant is a corporation incorporated under the laws of the State of Delaware and having its principal place of business at 699 8th Street, Suite 600, San Francisco, CA 94103.

### JURISDICTION

8.    The action arises under 28 U.S.C. §§ 1331 and 1338(a), as herein more fully appears, and the Court therefore has jurisdiction over this action.

9.    Upon information and belief, Defendant has its Corporate

---

[1] The specific claim language from these Letters Patent that is quoted herein is presented in both bold and italic font in the applicable paragraphs. This change in font is presented for the quoted claim language for purposes of clarity.

Headquarters located at 699 8th Street, Suite 600, San Francisco, CA 94103. Upon information and belief, Defendant's office located at this address is a regular and established place of business within the forum.

10.     Defendant is listed with the Office of the California Secretary of State as an entity that is currently doing business in the State of California, and the Office of the California Secretary of State has assigned Defendant the following business entity number: C2930987. A current Office of the California Secretary of State business listing for Defendant is attached herein as "Exhibit A". This business listing lists both the physical address and mailing address of Defendant as 699 8th Street, Suite 600, San Francisco, CA 94103. *See* Exhibit A at page 2. This business listing also lists the physical address for Defendant's "Agent for Service of Process" as this same physical address (699 8th Street, Suite 600, San Francisco, CA 94103). *See* Exhibit A at page 2.

11.     On October 12, 2006, Defendant filed a Statement and Designation by Foreign Corporation form with the Office of the California Secretary of State; a true and correct copy of this form is attached herein as "Exhibit B". The filing of this form on October 12, 2006, constituted a "REGISTRATION" by Defendant with the Office of the California Secretary of State. *See* Exhibit A at page 2. This form states that (i) the principal office of Defendant in the State of California as well as (ii) the principal executive office of Defendant were located at the same physical address in the City of San Francisco in the State of California at the time of this filing. *See* Exhibit B at page 2. This physical address is listed as 1895 Jackson Street #705, San Francisco, CA 94109. *See* Exhibit B at page 2.

12.     On October 1, 2018, Defendant filed a Statement of Information with the Office of the California Secretary of State; a true and correct copy of this Statement of Information is attached herein as "Exhibit C". This Statement of Information states that (i) the principal business office of Defendant in the State of California as well as (ii) the principal executive office of Defendant were located at the same physical address in the City of San Francisco in the State of California at

the time of this filing.  *See* Exhibit C at page 2.  This physical address is listed as 650 Townsend Street, STE 500, San Francisco, CA 94103.  *See* Exhibit C at page 2.  This Statement of Information also indicates that the address of Defendant's corporate Chief Executive Officer, corporate Secretary and corporate Chief Financial Officer was this same physical address at the time of this filing.

13.     On October 28, 2019, Defendant filed another Statement of Information with the Office of the California Secretary of State; a true and correct copy of this Statement of Information is attached herein as "Exhibit D".  This Statement of Information states that (i) the principal business office of Defendant in the State of California as well as (ii) the principal executive office of Defendant are located at the same physical address in the City of San Francisco in the State of California.  *See* Exhibit D at page 2.  This physical address is listed as 699 8th Street, Suite 600, San Francisco, CA 94103.  *See* Exhibit D at page 2.  This Statement of Information also indicates the address of Defendant's corporate Chief Executive Officer, corporate Secretary and corporate Chief Financial Officer as being this same physical address.

14.     Business information published by the City of San Francisco regarding the City of San Francisco business account (Business Account Number 430171) of Defendant is attached herein as "Exhibit E".[2]  Defendant is listed with the City of San Francisco as a business entity having a street address in the City of San Francisco at the following address: 650 Townsend Street, STE 380, San Francisco, CA 94103.  *See* Exhibit E, pages 2-3.  Additionally, the City of San Francisco lists a current mailing address for Defendant of 699 8th Street, Suite 600, San Francisco, CA 94103.  *See* Exhibit E, pages 3-4.

---

[2] A business listing published by the City of San Francisco (which was accessed at https://data.sfgov.org/Economy-and-Community/Registered-Business-Locations-San-Francisco/g8m3-pdis/data) was modified for legibility and to remove non-party entity information in order to create Exhibit E.

15.     Defendant maintains its company website at the following address: https://www.irhythmtech.com/.   A webpage from Defendant's current website states that Defendant's "HEADQUARTERS" is located at the following address: 699 8th Street, Suite 600, San Francisco, CA 94103.[3]   A copy of this webpage is attached herein as "Exhibit F".   Upon information and belief, Defendant's office located at 699 8th Street, Suite 600, San Francisco, CA 94103 serves as Defendant's Corporate Headquarters and is a regular and established place of business within the forum.

16.     Upon information and belief, Defendant continues to maintain a second office within the City of San Francisco at the following address: 650 Townsend Street, San Francisco, CA 94103.  *See* Exhibit E at pages 2-3.  *See also* Exhibit E at page 5.  Upon information and belief, Defendant's office located at 650 Townsend Street, San Francisco, CA 94103 is a regular and established place of business within the forum.

17.     In addition to its Corporate Headquarters being located within the State of California (within the subject forum), Defendant also discloses that it currently maintains yet another office within the State of California at the following address: 11085 Knott Avenue, Suite B, Cypress, California 90630.  *See* Exhibit F at page 2.  Upon information and belief, Defendant's office located at 11085 Knott Avenue, Suite B, Cypress, California 90630 is a regular and established place of business within the forum.

18.     The Statement of Information that Defendant filed on October 28, 2019, with the Office of the California Secretary of State lists Defendant's agent for service of process as being Sally J. Feng, who is located at the following address: 699 8th Street, Suite 600, San Francisco, CA 94103.  *See* Exhibit D at page 2.  This is the same physical address that Defendant discloses as its Corporate

---

[3] This webpage was accessed at https://www.irhythmtech.com/company/locations.

Headquarters.  *See* Exhibit F at page 2.

19.   As herein more fully appears, Defendant is a corporate entity currently doing business in the State of California and having regular and established places of business within the forum, Defendant purposefully engaged in activities that were directed at the forum, the action arises out of or relate to those activities, and the assertion of personal jurisdiction in the forum comports with traditional notions of fair play and substantial justice.   For at least this rationale, the Court has jurisdiction over Defendant in this action.

## VENUE

20.   As previously indicated, Defendant has regular and established places of business within the forum.  Additionally, as previously indicated, Defendant has regular and established business mailing addresses within the forum.  Moreover, and as herein more fully appears, Defendant committed acts of infringement, and those acts of infringement have been and continue to be directed at the forum.  For at least this rationale, venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and 1400(b).

21.   Upon information and belief, a number of individuals who are current employees of Defendant, and who have knowledge pertaining to the alleged infringing instrumentality (including, but not limited to, technical aspects, potential uses, and sales information associated with said instrumentality) currently work or reside within the forum, such as a number of those employees who currently work in Defendant's Corporate Headquarters located in the City of San Francisco in the State of California.  For at least this additional rationale, venue is proper in this Court.

22.   Upon information and belief, and as herein more fully appears, a number of individuals involved in the design and manufacture of various physical and circuit components of the alleged infringing instrumentality currently work or reside within the forum.  For at least this additional rationale, venue is proper in

this Court.

23.    This lawsuit has initially arisen in San Francisco County in the State of California, which is the county in which a substantial part of the events that give rise to the claim occurred.  Additionally, and as herein more fully appears, upon information and belief, a substantial number of witnesses having knowledge pertaining to the allegedly infringing instrumentality currently work or reside within the forum.  Moreover, as previously indicated, Defendant has regular and established places of business located within this District, including Defendant's Corporate Headquarters.  This District is therefore the most convenient forum for this action.

## INTRADISTRICT ASSIGNMENT

24.    This lawsuit has arisen in San Francisco County in the State of California, which is "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."  Civil L.R. 3-2(c).  The foregoing notwithstanding, it is noted that this Court has already declared that venue for cases involving "intellectual property rights … shall be proper in any courthouse in this District."  General Order No. 44, section D.3.

## PLAINTIFF'S ASSERTIONS AND STATEMENT OF THE CLAIM

### I.    Letters Patent and Standing.

25.    On October 7, 2014, U.S. Letters Patent No. 8,854,789 B2 was duly and legally issued to Jerry Alan Crandall for an invention in a SELF-DEFENSE SYSTEM.  A true and correct copy of the Letters Patent is attached herein as "Exhibit G".   The Letters Patent issued from U.S. Patent Application No. 13/181,467 (hereinafter "the Application"), which was filed with the U.S. Patent and Trademark Office (USPTO) on July 12, 2011.

26.    Jerry Alan Crandall assigned those Letters Patent to Plaintiff on October 25, 2016.  Jerry Alan Crandall was and remained the owner of the Letters

Patent until assigning those Letters Patent to Plaintiff on October 25, 2016.  A true and correct copy of the formal Assignment is attached herein as "Exhibit H".

27.     On October 25, 2016, Plaintiff recorded the formal Assignment of the Letters Patent from Jerry Alan Crandall to Plaintiff with the Assignment Recordation Branch of the Public Records Division of the USPTO.  A true and correct copy of the Patent Assignment Cover Sheet issued by the USPTO on October 25, 2016, is attached herein as "Exhibit I".  A true and correct copy of the Notice of Recordation of Assignment Document issued by the USPTO on October 26, 2016, is attached herein as "Exhibit J".

28.     Since being assigned the Letters Patent on October 25, 2016, Plaintiff has been and still is the owner of those Letters Patent.  As such, Plaintiff currently has standing to assert the Letters Patent within the forum.

29.     Plaintiff has listed the United States patent number (U.S. Patent No. 8,854,789 B2) of the Letters Patent on its company website since November 16, 2016.

30.     On August 24, 2020, Plaintiff sent, via the United States Postal Service, an envelope containing a true and correct copy of the Letters Patent along with a letter (dated August 24, 2020) to Defendant's Corporate Headquarters located at 699 8th Street, Suite 600, San Francisco, CA 94103.  Upon information and belief, the United States Postal Service delivered this envelope and its contents to Defendant on August 28, 2020.

31.     On August 28, 2020, Plaintiff e-mailed a true and correct copy of the Letters Patent, along with a copy of the aforementioned letter of August 24, 2020, to Defendant at the following e-mail address: communications@irhythmtech.com. Upon information and belief, this is a valid e-mail address for Defendant.

## II.   Activities and Instrumentalities.

32.     Upon information and belief, Defendant is a commercial entity that advertises, offers for sale and sells (i) heart monitors, including but not limited to

electrocardiogram (ECG) heart monitors, and (ii) medical diagnostic services, including, but not limited to, ECG monitoring services.  Defendant currently advertises, offers for sale and sells the ZIO AT® Mobile Cardiac Telemetry System (hereinafter the "Zio AT System") within the United States.  Screenshots of a webpage from Defendant's website that advertises the Zio AT System are attached herein as "Exhibit K".[4]  A user manual published by Defendant for the Zio AT System is attached herein as "Exhibit L".  Upon information and belief, Defendant currently advertises the Zio AT System within the forum.  *See, e.g.,* Exhibit K at pages 2-8.

33.    As herein more fully appears, the Zio AT System includes (i) a Patch Recorder and a Wireless Gateway Device, which are configured to establish a wireless Bluetooth® (hereinafter "Bluetooth") connection with one another.  The Patch Recorder adheres to a user's chest, records ECG data associated with the user's heart and wirelessly transmits this recorded data to the Wireless Gateway Device using the established Bluetooth connection.  *See, e.g.,* Exhibit L at page 3 (showing the adhered "Patch" and the "Gateway").  The Wireless Gateway Device wirelessly receives this ECG data from the Patch Recorder and subsequently transmits such data through a cellular network to a Monitoring Center operated by Defendant.  Additionally, and as herein more fully appears, Defendant offers a Zio Service, wherein Defendant receives this ECG data at the Monitoring Center and generates a Medical Report based on this data that is then provided to a user's medical doctor.  A sample Medical Report is attached herein as "Exhibit M".  Furthermore, and as herein more fully appears, the United States Food and Drug Administration (FDA) provided Defendant with clearance under Section 510(k) of the Federal Food, Drug and Cosmetic Act to market the Zio AT System within the

---

[4] This webpage was accessed at https://www.irhythmtech.com/products-services/zio-at.

United States in June of 2017.

34.   On June 19, 2015, the FDA provided Defendant with clearance under Section 510(k) of the Federal Food, Drug and Cosmetic Act to market Defendant's ZIO® (hereinafter "ZIO") SR ECG Monitoring Service within the United States. A copy of this pre-market FDA clearance, along with Defendant's referenced 510(k) Disclosure No. K143513 (prepared December 10, 2014) is attached herein as "Exhibit N".  In this technical disclosure, Defendant discloses that the ZIO SR ECG Monitoring Service has the following three components: (1) the ZIO SR Patch Recorder with Bluetooth technology, (2) the ZIO SR Wireless Gateway, and (3) the ZIO ECG Utilization Service System.  *See* Exhibit N at page 7, ¶2.  Upon information and belief, Bluetooth refers a particular wireless communication standard.

35.   On June 2, 2017, the FDA provided Defendant with clearance under Section 510(k) of the Federal Food, Drug and Cosmetic Act to market Defendant's ZIO QX ECG Monitoring System within the United States.  A copy of this pre-market FDA clearance, along with Defendant's referenced 510(k) Disclosure No. K163512 (prepared May 2, 2017) is attached herein as "Exhibit O".  In this technical disclosure, Defendant discloses that the ZIO QX ECG Monitoring System has the following three components: (1) the ZIO QX Patch Recorder with Bluetooth technology, (2) the ZIO QX Wireless Gateway with both Bluetooth and cellular technology, and (3) the ZIO ECG Utilization Service (ZEUS) System for data analysis and reporting.  *See* Exhibit O at page 7, ¶2.  Upon information and belief, Defendant subsequently rebranded the "ZIO QX" as the Zio AT.

36.   On June 8, 2017, MobiHealthNews published an Internet article discussing a number of FDA clearances that Defendant had received.  A copy of

this Internet article is attached herein as "Exhibit P".[5]  In this article, the author states that Defendant had received a clearance in "June" of "2017" for its "Zio AT ECG Monitoring System".  Exhibit P at page 2 (article dated "June 08, 2017") and at page 3, ¶3.

37.   On June 14, 2017, Defendant filed a trademark application with the USPTO for the commercial mark "ZIO AT".  *See* the USPTO Trademark Electronic Search System (TESS) search result for this commercial mark, which is attached herein as "Exhibit Q".[6]  The USPTO granted to Defendant a registration (registration number 5908625) for this commercial mark on November 12, 2019. *See* Exhibit Q at page 2.  This registration indicates that this commercial mark is used by Defendant as a "TRADEMARK" in the field of "heart monitors".  Exhibit Q at page 2.  This registration also indicates that this commercial mark is used by Defendant as a "SERVICE MARK" in the field of "medical diagnostic services". Exhibit Q at page 2.  This registration further discloses that Defendant's first use (and first use in commerce) of this commercial mark was on July 1, 2017.  Exhibit Q at page 2.  Defendant's current correspondence address for this registration is listed as Defendant's current Corporate Headquarters: 699 8th Street, Suite 600, San Francisco, CA 94103.  Exhibit Q at page 2.

38.   On August 29, 2018, the FDA provided Defendant with clearance under Section 510(k) of the Federal Food, Drug and Cosmetic Act to market an updated version of Defendant's ZIO AT ECG Monitoring System within the United States.  A copy of this pre-market FDA clearance, along with Defendant's referenced 510(k) Disclosure No. K181502 (prepared August 29, 2018) is attached

---

[5] This article was accessed at https://www.mobihealthnews.com/content/new-fda-clearances-zio-poised-finally-add-realtime-connected-monitoring.

[6] This search was conducted at http://tmsearch.uspto.gov/bin/gate.exe?f=searchss&state=4805:he6m2k.1.1.

herein as "Exhibit R".  In this technical disclosure, Defendant refers to its ECG monitoring system described in 510(k) Disclosure No. K163512 (*see* Exhibit O) as the ZIO AT ECG Monitoring System.  *See* Exhibit R at pages 6-8.

39.   Upon information and belief, Defendant began advertising and offering for sale the Zio AT System within the United States on July 1, 2017.  *See* Exhibit Q at page 2 (disclosing that Defendant's first use in commerce of its registered commercial mark "ZIO AT" was on July 1, 2017).  A clinical reference manual for the Zio AT System is attached herein as "Exhibit S".  Upon information and belief, this clinical reference manual was published by Defendant on or around April 11, 2018.  *See* Exhibit S at page 24.  An information disclosure for the Zio AT System is attached herein as "Exhibit T".  Upon information and belief, this information disclosure was published by Defendant on or around April 11, 2018. *See* Exhibit T at page 14.

40.   The Zio AT System includes a Patch Recorder.  *See, e.g.,* Exhibit O at page 6, ¶2.  The Patch Recorder is referred to by Defendant as, for example, the "Zio AT patch ECG monitor", the "Zio AT Patch" and the "Zio Patch".  *See, e.g.,* Exhibit S at pages 4 and 6.  A first set of photographs, which Defendant previously submitted to the United States Federal Communications Commission (FCC), showing the outside of an example of such a Patch Recorder is attached herein as Exhibit U.[7]  A second set of photographs, which Defendant previously submitted to the FCC, showing various example internal components of an example of such a Patch Recorder is attached herein as Exhibit V.[8]  A proposal, which Defendant previously submitted to the FCC, of how an example label may be affixed to an

---

[7] This first set of photographs is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT17P/External-Photos/External-Photos-3392982.

[8] This second set of photographs is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT17P/Internal-Photos/Internal-Photos-3392984.

example of such a Patch Recorder is attached herein as Exhibit W.[9]   A radio frequency (RF) exposure evaluation report, which Defendant previously submitted to the FCC, for an example of such a Patch Recorder is attached herein as Exhibit X.[10]

41.     The Patch Recorder includes a Patch Housing.  *See, e.g.,* Exhibit W at page 2 (both illustrating this Patch Housing and describing the Patch Housing as being a "clear plastic housing").   The Patch Recorder also includes a Circuitry Component that is housed within the Patch Housing.  *See, e.g.,* Exhibit V at pages 2-3.   The Circuitry Component includes a Circuitry Housing that houses two (2) Coin Cell Batteries as well as Patch Circuitry.  *See, e.g.,* Exhibit V at page 3 (showing the Circuitry Housing (as a white component) that houses first and second 3 volt (V) CR2032 batteries as well as a First Printed Circuit Board (PCB), wherein a number of circuit components are affixed to the First PCB).   These Coin Cell Batteries are "Lithium Manganese Dioxide Coin Cells".  Exhibit S at page 17; Exhibit T at page 9.

42.     The Patch Recorder also includes a number of Adhesive Members that enable the Patch Recorder to adhere to a user's chest.  *See, e.g.,* Exhibit K at pages 2-3.  *See also, e.g.,* Exhibit L at pages 3-5, 7 and 12.  *See also, e.g.,* Exhibit L at page 9 ("What should I do if the patch peels or lifts at the edges? Press evenly on the wings of the patch for 3 to 5 minutes to re-stick.") (emphasis in original omitted).  *See also, e.g.,* Exhibit S at page 6 (illustrating that the "Zio Patch" has two "Adhesive Wings").  *See also, e.g.,* Exhibit U at page 3, showing these two Adhesive Wings (to the left and right, respectively, of the Patch Housing).  The

---

[9] This proposal is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT17P/Label/ID-Label-Location-Info-3392983.

[10] This RF exposure evaluation report was downloaded at https://fccid.io/2AFBP-AT17P/RF-Exposure-Info/SAR-exclusion-report-3392989.

Patch Recorder further includes two ECG Electrodes. *See, e.g.,* Exhibit S at page 6 (illustrating that the "Zio Patch" has two "Electrodes"). *See also, e.g.,* Exhibit O at page 10 (disclosing the implementation of "Disposable ECG Electrodes"). Upon information and belief, page 3 of Exhibit U shows first and second Skin Contacts (illustrated as blue circular components) for these two ECG Electrodes, respectively. Upon information and belief, the two ECG Electrodes are electronically coupled with the Patch Circuitry.

43.    Upon information and belief, the Patch Recorder is configured to detect ECG signals (when the Patch Recorder adheres to a user's chest) using the ECG Electrodes and capture ECG data based on the detected ECG signals. *See, e.g.,* Exhibit L at pages 3, 7, 9 and 11. *See also, e.g.,* Exhibit O at page 6, ¶3 – page 7, ¶1. *See also, e.g.,* Exhibit O at page 10. The Patch Recorder will record ECG data for up to fourteen (14) days. *See, e.g.,* Exhibit S at page 8.

44.    The Patch Recorder further includes a Trigger Button. *See, e.g.,* Exhibit O at page 6, ¶3. *See also, e.g.,* Exhibit S at page 6 (illustrating the "'Zio' Button"). *See also, e.g.,* Exhibit L at page 3 (showing a user pressing the Trigger Button). *See also, e.g.,* Exhibit L at page 4 ("Press the button on your patch any time you feel a symptom …."). Upon information and belief, the Patch Circuitry includes a Switch, and pressing the Trigger Button toggles the Switch such that the Patch Circuitry, which is powered by the Coin Cell Batteries, generates an Electronic Trigger Signal.

45.    The Patch Recorder is integrated with a Wireless Transmitter capable of wirelessly transmitting Bluetooth signals. *See, e.g.,* Exhibit L at page 3. *See also, e.g.,* Exhibit O at page 6, ¶¶2-3. *See also, e.g.,* Exhibit S at page 16 and Exhibit T at page 8 (both disclosing a "Patch Short-range RF Transmit/Receive" characteristic as being "2.4 GHz Bluetooth Low Energy" with "Effective Radiated Power < 1mW"). *See also, e.g.,* Exhibit X at page 6 (listing the mode of operation for the "Zio AT ECG Patch" as being "Bluetooth LE", and further listing the type

of modulation for the "Zio AT ECG Patch" as being "Bluetooth version 4.0, Low Energy, GFSK modulation"). Indeed, upon information and belief, the Patch Circuitry includes a Wireless Microcontroller Unit (hereinafter "Wireless MCU") and a PCB Trace Antenna that are (i) mounted to PCB traces on the First PCB and (ii) implemented to transmit Bluetooth signals from the Patch Recorder. *See, e.g.,* Exhibit X at page 6 (disclosing the implementation of "TI chip CC2640" and a "PCB trace antenna"). Furthermore, upon information and belief, the Wireless Transmitter is implemented to wirelessly transmit a Bluetooth Signal from the Patch Recorder based on the generation of the Electronic Trigger Signal.

46.     Upon information and belief, this referenced TI chip CC2640 refers to an integrated circuit (IC) package developed by Texas Instruments Inc. (TI) having the product designation "CC2640". A webpage from the Texas Instruments website that describes the TI CC2640 is attached herein as Exhibit Y.[11] Texas Instruments describes the TI CC2640 as being "a wireless MCU targeting Bluetooth applications." Exhibit Y at page 3. Moreover, a screenshot of a webpage from the Texas Instruments website that shows a block diagram of the TI CC2640 is attached herein as Exhibit Z.[12] This block diagram specifically shows the "RF core" of this IC package being electronically coupled with an external antenna. Exhibit Z at page 2. Upon information and belief, the TI CC2640 is electronically coupled with the PCB Trace Antenna and configured to cause the PCB Trace Antenna to wirelessly transmit Bluetooth signals.

47.     The Patch Recorder further includes a Patch Light Emitter. *See, e.g,* Exhibit S at page 6 (illustrating the "Light" of the Zio Patch). *See also, e.g.,*

---

[11] This webpage was accessed at https://www.ti.com/product/CC2640#product-details##description.

[12] This webpage was accessed at http://www.ti.com/data-sheets/diagram.tsp?genericPartNumber=CC2640&diagramId=SWRS176B.

Exhibit L at page 10 (explaining that the "patch" is capable of "flashing orange"). Upon information and belief, the Patch Light Emitter is electronically coupled with the Patch Circuitry. Additionally, and upon information and belief, the Patch Light Emitter includes one or more light emitting diodes (LEDs).

48.     The Zio AT System also includes a Wireless Gateway Device. *See, e.g.,* Exhibit O at page 6, ¶2. *See also, e.g.,* Exhibit S at page 6. The Wireless Gateway Device is referred to by Defendant as, for example, the "Zio AT wireless gateway", the "Zio AT gateway", the "Zio gateway", the "wireless gateway" and the "gateway". Exhibit S at pages 4 and 8.

49.     Upon information and belief, in 2017, Defendant disclosed a First Example Configuration for such a Wireless Gateway Device to the FCC. A third set of photographs, which Defendant previously submitted to the FCC, showing a first example of such a Wireless Gateway Device is attached herein as Exhibit AA.[13]   A fourth set of photographs, which Defendant previously submitted to the FCC, showing various example internal components of a first example of such a Wireless Gateway Device is attached herein as Exhibit AB.[14]   A proposal, which Defendant previously submitted to the FCC, of how an example label may be affixed to a first example of such a Wireless Gateway Device is attached herein as Exhibit AC.[15]   A specific absorption rate (SAR) test report, which Defendant previously submitted to the FCC, for a first example of such a Wireless Gateway

---

[13] This third set of photographs is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT17G/External-Photos/External-Photos-3391651.

[14] This fourth set of photographs is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT17G/Internal-Photos/Internal-Photos-3391653.

[15] This proposal is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT17G/Label/ID-Label-Location-Info-3391652.

1    Device is attached herein as Exhibit AD.[16]

2      50. Upon information and belief, in 2018, Defendant disclosed a Second

3    Example Configuration for such a Wireless Gateway Device to the FCC.  A fifth

4    set of photographs, which Defendant previously submitted to the FCC, showing a

5    second example of such a Wireless Gateway Device is attached herein as Exhibit

6    AE.[17]  A sixth set of photographs, which Defendant previously submitted to the

7    FCC, showing various example internal components of a second example of such a

8    Wireless Gateway Device is attached herein as Exhibit AF.[18]  A proposal, which

9    Defendant previously submitted to the FCC, of how an example label may be

10   affixed to a second example of such a Wireless Gateway Device is attached herein

11   as Exhibit AG.[19]  A specific absorption rate (SAR) test report, which Defendant

12   previously submitted to the FCC, for a second example of such a Wireless

13   Gateway Device is attached herein as Exhibit AH.[20]

14     51. The Wireless Gateway Device includes a Wireless Gateway integrated

15   with a Wireless Receiver capable of wirelessly receiving Bluetooth signals.  *See,*

16   *e.g.,* Exhibit L at page 3.  *See also, e.g.,* Exhibit O at page 6, ¶¶2-5.  *See also, e.g.,*

17   Exhibit AH at page 7 ("Cellular + Bluetooth").  *See also, e.g.,* Exhibit S at page 16

18   and Exhibit T at page 8 (both disclosing a "Gateway Short-range RF

---

[16] This SAR test report was downloaded at https://fccid.io/2AFBP-AT17G/RF-Exposure-Info/SAR-Report-3391692.

[17] This fifth set of photographs is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT18G/External-Photos/External-Photographs-3875350.

[18] This sixth set of photographs is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT18G/Internal-Photos/Internal-Photographs-3875351.

[19] This proposal is publicly accessible and was downloaded at https://fccid.io/2AFBP-AT18G/Label/Label-3875360.

[20] This SAR test report was downloaded at https://fccid.io/2AFBP-AT18G/RF-Exposure-Info/SAR-Report-3875387.

Transmit/Receive" characteristic as being "2.4 GHz Bluetooth Low Energy" with "Effective Radiated Power < 1mW"). Upon information and belief, the Wireless Receiver of the Wireless Gateway is capable of wirelessly receiving ECG data from the Wireless Transmitter of the Patch Recorder when a Bluetooth connection exists between the Wireless Gateway and the Patch Recorder.

52. The Wireless Gateway is also integrated with a Cellular Transmitter capable of wirelessly transmitting cellular signals. *See, e.g.*, Exhibit AH at page 7 ("Cellular + Bluetooth"). *See also, e.g.*, Exhibit L at page 7 ("The gateway should also be kept in a place with good cellular connection."). *See also, e.g.*, Exhibit L, page 8 ("Note that the gateway will not have cellular connection outside the United States."). *See also, e.g.*, Exhibit S at page 10 ("The gateway will store the data until it has cell signal, then the data will be sent."). *See also, e.g.*, Exhibit S at page 16 and Exhibit T at page 8 (both disclosing a "Gateway Cellular RF Transmit/Receive" characteristic).

53. The Wireless Gateway includes a Battery Unit. *See, e.g.*, Exhibit AF at page 2 (wherein the Battery Unit is labeled as "HOUSE OF BATTERIES"). This Battery Unit includes a "Lithium Polymer Cell". Exhibit S at page 17; Exhibit T at page 9. The Wireless Gateway also includes a Second PCB. *See, e.g.*, Exhibit AF at page 2. The Battery Unit is electronically coupled with PCB traces on the Second PCB. *See, e.g.*, Exhibit AF at page 2 (showing red and black wires extending from the Battery Unit to the Second PCB). Upon information and belief, the Battery Unit provides the Wireless Gateway with electrical power so that the Wireless Gateway can function for its intended purpose.

54. The Wireless Gateway includes an Embedded Antenna electronically coupled with PCB traces of the Second PCB. *See* the component labeled "PA.26A" in Exhibit AF at page 3. Upon information and belief, the Embedded Antenna was manufactured by or on behalf of Taoglas Limited ("Taoglas") and is identified as Taoglas part number PA.26A. Screenshots of a webpage from the

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Taoglas website that provides information about this component are attached herein as Exhibit AI.[21]   The Embedded Antenna is capable of wirelessly transmitting cellular signals.   *See, e.g.,* Exhibit AI at page 3 ("The PA.26A operates at all common 4G/3G/2G LTE bands; 698MHz to 960MHz, 1710MHz to 2700MHz.").   Upon information and belief, Defendant has abandoned the First Example Configuration for the Wireless Gateway Device, and the latest Zio AT System currently implements the Second Example Configuration as an upgraded, 4G version of the Wireless Gateway Device.   *See, e.g.,* Exhibit AI at page 3 ("The antenna dimensions and footprint [for the PA.26A] are exactly the same as the PA.25A, providing customers with a drop-in conversion from 2G/3G to 4G systems.").   *See also, e.g.,* Exhibit AB at page 3 (showing the "PA-25" component of the First Example Configuration disclosed to the FCC in 2017) and Exhibit AF at page 3 (showing the "PA.26A" of the Second Example Configuration disclosed to the FCC in 2018).

15
16
17
18
19
20
21
22
23
24
25

55.   The Wireless Gateway also includes a Cellular Module electronically coupled with PCB traces of the Second PCB.   *See* the component labeled "SARA-R410M" in Exhibit AF at page 3.   Upon information and belief, the Cellular Module was manufactured by or on behalf of u-Blox and is identified as u-Blox part number SARA-R410M, which is a member of the u-Blox SARA-R4 series of cellular modules.   A product summary published by u-Blox for the SARA-R4 series of cellular modules is attached herein as Exhibit AJ.   The u-Blox series of cellular modules are capable of supporting LTE cellular communications.   *See, e.g.,* Exhibit AJ at pages 2-3.   Upon information and belief, the Cellular Module is electronically integrated with the Embedded Antenna and is configured to cause the Embedded Antenna to wirelessly transmit cellular signals.

26

56.   The Wireless Gateway also includes a 32-bit Microcontroller Unit

27
28

---

[21] This webpage was accessed at https://www.taoglas.com/product/pa-26a-anam/.

(MCU) electronically coupled with PCB traces of the Second PCB. *See* the component labeled "EFM®32" in Exhibit AF at page 3. Upon information and belief, the 32-bit MCU was manufactured by or on behalf of Silicon Laboratories, Inc. ("Silicon Labs") and is identified as Silicon Labs part number EFM32. A webpage from the Silicon Labs website that provides information about this component is attached herein as Exhibit AK.[22] The 32-bit MCU has a Processing Core. This Processing Core is the ARM® Cortex® M3 ("Cortex M3") processing core. *See, e.g.,* Exhibit AK at page 2. *See also, e.g.,* the label "Cortex-M3" shown on the 32-bit MCU in Exhibit AF at page 3. A webpage from the Silicon Labs website that provides information about the Cortex M3 processing core is attached herein as Exhibit AL.[23] Upon information and belief, the Processing Core of the 32-bit MCU is implemented to execute stored instructions to thereby enable the Wireless Gateway to function for its intended purpose.

57.    The Wireless Gateway also includes a Transducer electronically coupled with PCB traces of the Second PCB. *See* the component labeled "T0727SR" in Exhibit AF at page 3. Upon information and belief, the Transducer was manufactured by or on behalf of PUI Audio, Inc. ("PUI") and is identified as PUI part number T0727SR. A product overview published by PUI that provides information about this component is attached herein as Exhibit AM. Upon information and belief, the Wireless Gateway Device is capable of emitting sound. *See, e.g.,* Exhibit L at page 10 ("As long as it is able to send data, the gateway will not flash or make noise."). Additionally, upon information and belief, it is the Transducer that is capable of generating this sound based on an electronic input. *See, e.g.,* Exhibit AM at page 4 (showing the Transducer's "SOUND HOLE").

---

[22] This webpage was accessed at https://www.silabs.com/mcu/32-bit.

[23] This webpage can be accessed at https://www.silabs.com/products/mcu/32-bit/arm-cortex-m3-32-bit-microcontroller.

Moreover, upon information and belief, the Wireless Gateway includes circuitry configured to provide a particular electronic signal to the Transducer such that the Transducer can translate this electronic signal into a sound wave that is propagated through the air.

58.     In addition to the Wireless Gateway, the Wireless Gateway Device also includes an external Gateway Housing.  *See, e.g.,* Exhibit AE at page 2.  The Gateway Housing houses the Wireless Gateway of the Wireless Gateway Device.  *See, e.g.,* Exhibit AF at page 2, showing the Gateway Housing opened such that various example internal components are exposed for the subject FCC technical disclosure.  Upon information and belief, the Gateway Housing is sized to fit within a user's hand such that the user is able to wrap the user's fingers around the Gateway Housing to thereby enable the user to hold the Gateway Housing.  *See, e.g.,* Exhibit L at page 12 (showing a user's hand relative to the Wireless Gateway Device).  Additionally, the Gateway Housing has a textured outer surface that aids the ability of the user's fingers to grip the Gateway Housing.  *See, e.g.,* Exhibit AE at page 2.

59.     The Gateway Housing comprises a Front External Cover (*see* Exhibit AE at page 2) and a Back External Cover (*see* Exhibit AE at page 3).  The Front External Cover is moveably coupled with the Back External Cover by first and second Hinges.  *See, e.g.,* Exhibit AE at pages 2-3 (showing first and second Hinges at the top side of the Wireless Gateway Device when the Gateway Housing is in a closed configuration).  *See also, e.g.,* Exhibit L at page 12 and Exhibit AE at page 4 (both showing the Gateway Housing in an opened configuration).  Both the Front External Cover and the Back External Cover are sized to conform to a shape of an appendage when the Gateway Housing is in a closed configuration.  Indeed, each such cover is sized to fit within a user's hand when the Gateway Housing is in a closed configuration such that the user is able to wrap the user's fingers around said cover to thereby enable the user to hold that cover.  *See, e.g.,* Exhibit L at page

12, showing a user's hand relative to the Wireless Gateway Device.  Additionally, each such cover has a textured outer surface that aids the ability of the user's fingers to grip such cover.  *See, e.g.,* Exhibit AE at pages 2-3.

60.    The Wireless Gateway Device further includes an External Clip.  *See, e.g.,* Exhibit AE at page 3, showing the External Clip as being positioned adjacent to the Back External Cover and extending from the Gateway Housing.  The External Clip is capable of extending around a user's belt to thereby hold the Wireless Gateway Device to the user's belt.  *See, e.g.,* Exhibit L at page 8 ("You may also use the provided belt clip to carry the gateway.").  *See also, e.g.,* Exhibit K at page 3 (showing how the Wireless Gateway Device can be worn on a user's belt).  Upon information and belief, the user may wrap and secure this belt around, for example, the user's waist, leg, arm or hand.  Additionally, upon information and belief, the External Clip is also capable of extending around a user's hand or finger to thereby hold the Wireless Gateway Device to said hand or finger.  Upon information and belief, the External Clip is also capable of extending around, for example, a user's sock, armband or glove to thereby hold the Wireless Gateway Device to, for example, the user's leg, arm or hand.

61.    Defendant's user manual for the Zio AT System includes an illustration showing a user carrying the Wireless Gateway Device in a Mobile Carrier.  *See* Exhibit L at page 4.  The Mobile Carrier includes a Strap that fits around a user's arm such that the user can carry the Mobile Carrier, and the Wireless Gateway Device positioned therein, while the user is on the move.  *See* Exhibit L at page 4.  Additionally, Defendant informs users of the ZIO AT System that users "[c]an [] carry the gateway in a purse, bag or pocket".  Exhibit L at page 8.

62.    The Wireless Gateway Device includes a "Star Button" labeled with a star symbol.  Exhibit S at page 6.  Upon information and belief, the Star Button is integrated with circuitry of the Wireless Gateway, and pushing the Star Button

1
2
3
4
5
6
7
8
9
10
11

causes such circuitry of the Wireless Gateway to generate an electronic signal, wherein the Wireless Gateway is configured to attempt to establish a Bluetooth connection between the Wireless Gateway and the Patch Recorder based on this electronic signal. *See, e.g.,* Exhibit L at page 6 ("To reconnect, hold the star button … for 3 seconds until the orange light stays on. If the light flashes green, the gateway has reconnected to the patch.") (emphasis in original omitted). When such a Bluetooth connection between the Wireless Gateway and the Patch Recorder is established, the "Patch Connection Light" (shown in Exhibit S at page 6) of the Wireless Gateway Device emits light to indicate the established Bluetooth connection. *See, e.g.,* Exhibit L at page 6 ("If the light flashes green, the gateway has reconnected to the patch.").

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

63.     The Wireless Gateway Device also includes an "Airplane Button" labeled with an airplane symbol. Exhibit S at page 6. Upon information and belief, the Airplane Button is integrated with circuitry of the Wireless Gateway, and pushing the Airplane Button causes such circuitry of the Wireless Gateway to generate an electronic signal, wherein the Wireless Gateway is configured to toggle between a cellular signal transmission mode and a cellular signal non-transmission mode based on this electronic signal. In particular, when the Wireless Gateway is connected to a cellular network, pushing the Airplane Button will cause the Wireless Gateway to disconnect from such network (in which case the Wireless Gateway will be in an Airplane Mode), and when the Wireless Gateway is disconnected from that cellular network, pushing the Airplane Button will cause the Wireless Gateway to connect to said network (in which case the Wireless Gateway will no longer be in the Airplane Mode). *See, e.g.,* Exhibit L at page 11. Furthermore, upon information and belief, when the Airplane Button is pushed such that the Wireless Gateway disconnects from the cellular network, the "Airplane Mode Light" (shown in Exhibit S at page 6) of the Wireless Gateway Device flashes light to indicate that the Wireless Gateway has been put into the

Airplane Mode (and that the Wireless Gateway is therefore no longer transmitting cellular information).  *See, e.g.,* Exhibit L at page 11.

64.    Defendant operates a Monitoring Center that receives the recorded ECG data from the Wireless Gateway Device.  *See, e.g.,* Exhibit S at page 4, ¶6 ("While continuously recording patient ECG, both patient-triggered and automatically detected arrhythmia events are transmitted to a monitoring center for reporting.").  In particular, upon information and belief, the Cellular Transmitter of the Wireless Gateway wirelessly transmits the ECG data to a cellular network such that this data is routed to the Monitoring Center.  *See, e.g.,* Exhibit S at page 4, ¶1 ("Zio AT wireless gateway … provides connectivity between the patch and the iRhythm monitoring center").  *See also, e.g.,* Exhibit S at page 4, ¶2 ("The wireless transfer of data is enabled by the Zio AT gateway, which requires proximity and reception but no patient interaction to transmit to the monitoring center.").

65.    Defendant offers a Zio Service, wherein Defendant receives the ECG data at the Monitoring Center, processes this data, analyzes the processed results, generates a Medical Report based on this analysis, and provides this Medical Report to a user's medical doctor.  In particular, after Defendant receives the recorded ECG data, Defendant implements a Detection Algorithm to process this data, wherein the Detection Algorithm is configured to detect cardiac arrhythmias that are indicated by the ECG data.  *See, e.g.,* Exhibit S at page 4, ¶¶1-2 (discussing Defendant's "Zio arrhythmia detection algorithm").  *See also, e.g.,* Exhibit O at page 6, ¶5 (discussing Defendant's "ZEUS detection algorithm"). The ECG data is processed by the Detection Algorithm, and the resulting detection results are then delivered to a Software Workflow Tool that enables Defendant's Certified Cardiographic Technicians (CCTs), who are trained to follow Defendant's internal procedures for the processing of the ECG data, to review and/or adjust the detection results for accuracy.  *See, e.g.,* Exhibit O at page 6, ¶5. *See also, e.g.,* Exhibit S at page 4, ¶4.  Indeed, Defendant discloses to the CCTs

performance limitations with both the Detection Algorithm and the Software Workflow Tool.  *See, e.g.,* Exhibit O at page 6, ¶5.  All anomalies with the detection results of the Detection Algorithm are visible to the CCTs, and, where appropriate, the CCTs manually corrected the detection results during a quality assurance review of such results.  *See, e.g.,* Exhibit O at page 6, ¶5.  The CCTs use the corrected detection results to generate the Medical Report, which serves as a final report of the ECG findings contained within the recorded ECG data.  *See, e.g.,* Exhibit O at page 6, ¶5.  *See also, e.g.,* the sample Medical Report shown in Exhibit M at pages 2-21.  This sample Medical Report was generated by Defendant in the year 2019.  *See, e.g.,* Exhibit M at page 2 ("© 2019 iRhythm Technologies, Inc.").

66.    Pushing the Trigger Button on the Patch Recorder when (i) a Bluetooth connection exists between the Patch Recorder and the Wireless Gateway and (ii) the Wireless Gateway has cellular service causes the Wireless Gateway to transmit ECG data recorded by the Patch Recorder to the Monitoring Center.  *See, e.g.,* Exhibit O at page 6, ¶3 ("Additionally, patients have the option of pressing a convenient trigger button which marks the continuous record and initiates the wireless transfer of a 90-second ECG strip. The wireless transfer of data is enabled by the Zio® QX Gateway, which requires Bluetooth proximity to the Patch and cellular network reception but no patient interaction to transmit to the monitoring center.").  *See also, e.g.,* Exhibit L at page 9, ¶5 ("What happens if I press the patch button while the gateway doesn't have cell signal? The gateway will store the data until it has cell signal, then the data will be sent.") (emphasis in original omitted).  In particular, upon information and belief, the Electronic Trigger Signal causes the Wireless Transmitter of the Patch Recorder to transmit a Wireless Trigger Signal to the Wireless Gateway, and the Wireless Gateway then transmits a Cellular Signal to a cellular network that indicates ECG data recorded by the Patch Recorder, and this ECG data is routed to the Monitoring Center through the

cellular network.

67.    Furthermore, upon information and belief, pushing the Trigger Button on the Patch Recorder when a Bluetooth connection exists between the Patch Recorder and the Wireless Gateway causes the Wireless Gateway to store a Patient Trigger Mark corresponding to ECG data recorded by the Patch Recorder.  *See, e.g.,* Exhibit O at page 6, ¶3 ("Additionally, patients have the option of pressing a convenient trigger button which marks the continuous record and initiates the wireless transfer of a 90-second ECG strip. The wireless transfer of data is enabled by the Zio® QX Gateway, which requires Bluetooth proximity to the Patch and cellular network reception but no patient interaction to transmit to the monitoring center.").  *See also, e.g.,* Exhibit L at page 9, ¶5 ("What happens if I press the patch button while the gateway doesn't have cell signal? The gateway will store the data until it has cell signal, then the data will be sent.") (emphasis in original omitted).  In particular, upon information and belief, the Electronic Trigger Signal causes the Wireless Transmitter of the Patch Recorder to transmit a Wireless Trigger Signal to the Wireless Gateway, and the Wireless Gateway then stores (within a Local Storage Unit of the Wireless Gateway) information indicating the Patient Trigger Mark.   This information is subsequently transmitted by the Wireless Gateway within the Cellular Signal such that this information is routed to the Monitoring Center through the cellular network.  Upon information and belief, this Patient Trigger Mark indicates to the Detection Algorithm and the CCTs that the user was experiencing cardiac-related symptoms.  *See, e.g.,* Exhibit L at page 9, ¶1.  *See also, e.g.,* Exhibit M at page 3 (showing an indication of a patient trigger during a specific period of time on March 27, 2019 that corresponds to relative drop in the detected heart rate).  *See also, e.g.,* Exhibit M at page 4 (showing an indication of a patient trigger during a specific period of time on March 29, 2019 that corresponds to relative drop in the detected heart rate).  *See also, e.g.,* Exhibit M at pages 6-7 (indicating a "Patient Trigger Marker" (in red) for March 27, 2019

and March 29, 2019).

68.   An example policy on cardiac monitoring that was previously published by an example medical insurance company (Aetna) is attached hereto as "Exhibit AN".   Upon information and belief, a number of medical insurance companies within the United States consider the use of ECG monitoring systems (such as the Zio AT System) to be medically necessary in certain circumstances. *See, e.g.*, Exhibit AN at page 5 ("Aetna considers the use of long-term (greater than 48 hours) external ECG monitoring by continuous rhythm recording and storage (e.g., Zio Patch) medically necessary for the following ….").   Indeed, Aetna explicitly mentions the "Zio Patch" as an example when declaring its official policy on "medically necessary" ECG monitoring.   Exhibit AN at page 5.

69.   First and second webpages from Defendant's website advertises the use of commercial medical insurance and Medicare for its products and services. A copy of the first such webpage is attached herein as Exhibit AO.[24]   A copy of the second such webpage is attached herein as Exhibit AP.[25]   Upon information and belief, Defendant accepts both commercial medical insurance and Medicare for (i) the Zio AT System and (ii) services that Defendant provides in connection with the Zio AT System.   *See, e.g.*, Exhibit AO at page 2 (wherein Defendant states that it has "secured contracts with all major commercial payers and Medicare").   *See also, e.g.*, Exhibit AP at pages 2-3.

70.   On January 30, 2017, CNBC published an online news article about Defendant.   A copy of this news article is attached herein as "Exhibit AQ".[26]   This article states that "The Zio patch is more expensive than older monitors: about

---

[24] This webpage was accessed at https://www.irhythmtech.com/insurance.

[25] This webpage was accessed at https://www.irhythmtech.com/patients/insurance-billing.

[26] This news article was accessed at https://www.cnbc.com/2017/01/30/tiny-patch-powering-big-data-is-changing-the-way-we-monitor-heartbeats.html.

$360 for Medicare versus $100 to $150 for Holter monitors". Exhibit AQ at page 6. Additionally, on July 22, 2017, Stirling Strategic Investor published an online investment article about Defendant. A copy of this investment article is attached herein as Exhibit AR.[27] This article states that the "Zio patch" costs $360.

71. Upon information and belief, in January of 2020, Defendant presented financial information pertaining to the Zio AT System at a healthcare conference, and Defendant has published slides from this presentation on its website. These published slides are attached herein as Exhibit AS.[28] Defendant claims in these published slides that it raised approximately $100 million in capital in 2019 to fund growth initiatives. Exhibit AS at page 16. Defendant also claims in these published slides that it was on track to deliver 45% revenue growth in year 2019 according to information updated as of December 23, 2019. Exhibit AS at page 16. Additionally, Defendant discloses that it has two wearable biosensor models: the Zio AT and the Zio XT models. *See, e.g.,* Exhibit AS at pages 4, 5 and 12. Defendant claims to have fully launched the Zio AT System in October of 2019. *See, e.g.,* Exhibit AS at page 16. Moreover, Defendant claims that the Zio AT System is driving accelerated adoption of its wearable biosensors. *See* Exhibit AS at page 12. Indeed, Defendant discloses that the "120 Day Volume Growth Post-Zio[AT] Launch" was more than 27% for the Zio XT model, while such growth was more than 48% for both the Zio AT and the Zio XT models combined. Exhibit AS at page 12.

72. On March 2, 2020, Defendant filed an Annual Report with the United States Securities and Exchange Commission (SEC) pursuant to Section 13 or 15(d)

---

[27] This investment article was accessed at
https://stirlingstrategicinvestor.com/2017/07/22/uncomman-idea-heart-health/.

[28] These published slides were downloaded at
https://investors.irhythmtech.com/presentations.

of the Securities and Exchange Act of 1934.  A copy of this Annual Report is attached herein as "Exhibit AT".  In this Annual Report, Defendant states, "The ambulatory cardiac monitoring market is well-established with an estimated 4.6 million diagnostic tests performed annually in the United States, which we believe to be an existing $1.8 billion market opportunity for our Zio service."  Exhibit AT, page 5, ¶3.  Additionally, in this Annual Report, Defendant stated, "Our revenue was $214.6 million and $147.3 million for the years ended December 31, 2019 and 2018, respectively …."  Exhibit AT at page 6, ¶6.  Additionally, in this Annual Report, Defendant states:

> Revenue increased $67.3 million, or 46%, to $214.6 million during the year ended December 31, 2019 from $147.3 million during the year ended December 31, 2018. The increase in revenue was attributable to the increase in volume of the Zio services performed as a result of the expansion of coverage and the increase in the number of payors under contract, increasing physician acceptance and expansion of our sales force as we continue to gain market acceptance for our Zio service.

Exhibit AT at page 64, ¶4.

73.     Upon information and belief, Medicare and Medicaid payments made to Defendant accounted for approximately 28%, 27% and 27% of Defendant's revenue for years 2017, 2018 and 2019, respectively.  *See* Exhibit AT at page 86, ¶3 ("Centers for Medicare and Medicaid Services ("CMS"), accounted for approximately 27%, 27% and 28% of the Company's revenue for the years ended December 31, 2019, 2018 and 2017, respectively.").     Additionally, upon information and belief, Medicare and Medicaid payments made to Defendant accounted for approximately 20% of Defendant's accounts receivable for each of years 2018 and 2019.  *See* Exhibit AT at page 86, ¶3 ("CMS accounted for 20% and 20% of accounts receivable as of December 31, 2019 and 2018, respectively.").

74.     The Zio AT System is manufactured in the United States.  *See, e.g.,* Exhibit AT at page 6, ¶6 ("We manufacture our devices in Cypress, California.").

*See also* Exhibit AT at page 24, ¶1:

> We manufacture our ambulatory cardiac monitors, Zio XT and Zio AT, in our leased facilities in Cypress, California. This 14,616 square foot facility provides space for our assembly and production operations, including packaging, storage and shipping. We believe our manufacturing facilities will be sufficient to meet our manufacturing needs for at least the next two years.

75. With respect to two surveys conducted by the Licensing Executives Society (in years 2011 and 2014, respectively) of patent licensing deals within the high technology sector, the 2014 Executive Summary of the 2014 survey is attached herein as Exhibit AU.[29] This 2014 Executive Summary states that the combined samples of the 2011 and 2014 surveys yield an average royalty rate for patent licenses of 5.75 percent and a median royalty rate for patent licenses of 5 percent. *See* Exhibit AU at page 2.

76. An online article from the intellectual property news publisher IPWatchdog.com that is dated March 5, 2019, is attached herein as Exhibit AV.[30] Further to the aforementioned 2011 and 2014 surveys, this article addresses yet another survey conducted by the Licensing Executives Society in year 2017 of patent licensing deals within the high technology sector. *See, e.g.,* Exhibit AV at page 2. This article indicates that, over the 10-year period from 2008 to 2017, the combined samples of the 2011, 2014 and 2017 surveys yield an average royalty rate for patent licenses of 5.73 percent and a median royalty rate for patent licenses of 5 percent. *See* Exhibit AV at page 4.

77. An online article from the intellectual property research firm Intellectual Property Research Associates, Inc., that is dated March 2, 2018, is

---

[29] A publicly accessible hyperlink to this 2014 Executive Summary was accessed at https://members.lesusacanada.org/page/royaltyrates.

[30] This article was accessed at https://www.ipwatchdog.com/2019/03/05/licensing-executives-society-high-tech-deal-term-royalty-rate-survey/id=107013/.

COMPLAINT FOR:
PATENT INFRINGEMENT

29

Case No. 20-cv-06220

attached herein as Exhibit AW.[31]  This article states that "over … two decades of research" have led to the conclusion that "the most frequently negotiated royalty term is 5% of sales".  Exhibit AW at page 2.  The article further indicates that this royalty rate of 5 percent of sales "is found across a diverse number of industries including … communications, … defense, … electronics, … [and] medical …." Exhibit AW at pages 2 and 3.

78.    A patent royalty rate guide for various industries is attached herein as "Exhibit AX".[32]  This patent royalty rate guide provides "Industry Standard Royalty Rates" for various industries.  Exhibit AX at page 3.  In particular, this patent royalty rate guide indicates that the standard royalty rate in the "Healthcare Products / Equipment" industry is 6.4 percent.  Exhibit AX at page 4. Additionally, this patent royalty rate guide indicates that the standard royalty rate in the "Electronics" industry is 5.1 percent.  Exhibit AX at page 4.

79.    Various claims of the Letters Patent were previously asserted in *Crandall Technologies LLC v. GreatCall Inc.*, Case No. 18-cv-1396-CAB-MDD (S.D. Cal. 2018), and, on May 28, 2019, the United States District Court for the Southern District of California issued a Claim Construction Order construing certain claim terms found in the Letters Patent for that case.  A copy of this Claim Construction Order is attached herein as Exhibit AY.

## III.    **Direct Infringement.**

80.    Defendant, by selling and offering for sale, within the United States, the Zio AT System has for a long time past and still is directly infringing Claims 1-

---

[31] This article was accessed at http://www.ipresearch.com/2018/03/02/5-is-the-most-common-royalty-rate/.

[32] This patent royalty rate guide was accessed at https://assets.entrepreneur.com/article/1406054592-one-stop-guide-royalty-rates-infographic.jpg?_ga=2.133754254.1265232303.1540334515-1331670011.1540334515.

5, 8, 9, 13, 16 and 17 of the Letters Patent, in violation of 35 U.S.C. § 271(a), and will continue to do so unless enjoined by this Court.

81.    Defendant, by using, within the United States, the Zio AT System has for a long time past and still is directly infringing Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent, in violation of 35 U.S.C. § 271(a), and will continue to do so unless enjoined by this Court.

A.    **Claim 1**

82.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

83.    Independent Claim 1 of the Letters Patent recites, "***A self-defense system comprising: a material sized to conform to an appendage; a pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal; and a defense unit coupled with said material, said defense unit integrated with a wireless receiver configured to wirelessly receive said pressure input signal from said wireless transmitter, and said defense unit configured to initiate a defense event based on said pressure input signal.***"

84.    The Zio AT System is a "***self-defense system***", as recited in Independent Claim 1, at least because the Zio AT System functions to protect the user or the user's interests.  Indeed, upon information and belief, and as previously indicated, a number of medical insurance companies within the United States consider the use of ECG monitoring systems (such as the Zio AT System) to be medically necessary in certain circumstances.

85.    The Zio AT System functions to protect the user or the user's interests by capturing important cardiac information in real-time, such as, for example, during a heart attack suffered by the user, or such as during an attack on the user by another person (or by an animal), wherein such captured information would

otherwise be lost or unknown. The Zio AT System also functions to protect the user or the user's interests by transmitting that captured information to a preselected entity (the Monitoring Center) in real-time. The Zio AT System also functions to protect the user or the user's interests by enabling a timely review and analysis of the captured information to be conducted by Defendant's CCTs, and by enabling the Medical Report to be forwarded to the user's physician such that medical treatment for identified cardiac problems can begin in a timely fashion.

86. Equivalents of the term "*self-defense system*", as recited in Independent Claim 1, were never sacrificed during prosecution of the Application within the USPTO. As such, the term "*self-defense system*" covers self-defense systems as well as all equivalent systems.

87. The Zio AT System is equivalent to a "*self-defense system*", as recited in Independent Claim 1, at least because the Zio AT System performs substantially the same function, in substantially the same way, to yield substantially the same result, as herein more fully appears.

88. The foregoing notwithstanding, and with respect to these same Letters Patent, it is noted that the United States District Court for the Southern District of California has ruled that the term "*self-defense*" in the preamble of Independent Claim 1 is not a claim limitation. *See* Exhibit AY, page 3, lines 3-7.

89. The Gateway Housing (or the Front External Cover or the Back External Cover of the Gateway Housing) is analogous to the "*material sized to conform to an appendage*", as recited in Independent Claim 1, at least because such component has a size sufficient to enable that component to fit within a user's hand and enable the user's fingers to wrap around and hold the component when the Gateway Housing is in a closed configuration.

90. Additionally, the External Clip is analogous to the "*material sized to conform to an appendage*", as recited in Independent Claim 1, at least because the External Clip is sized to extend around a user's hand or finger to thereby hold the

Wireless Gateway Device to said hand or finger.

91.     Moreover, equivalents of the language "*material sized to conform to an appendage*", as recited in Independent Claim 1, were never sacrificed during prosecution of the Application within the USPTO.   As such, the language "*material sized to conform to an appendage*" covers materials sized to conform to an appendage as well as all equivalent materials.

92.     The Gateway Housing (or the Front External Cover or the Back External Cover of the Gateway Housing)  is equivalent to a "*material sized to conform to an appendage*", as recited in Independent Claim 1, at least because the such component performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

93.     The External Clip  is equivalent to a "*material sized to conform to an appendage*", as recited in Independent Claim 1, at least because the such component performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

94.     The Patch Recorder is analogous to the "*pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal*", as recited in Independent Claim 1, at least because (i) the Patch Recorder generates a signal when a user pushes the Trigger Button and (ii) the Patch Recorder is integrated with the Wireless Transmitter.

95.     Moreover, equivalents of the term "*pressure sensor unit*", as recited in Independent Claim 1, were never sacrificed during prosecution of the Application within the USPTO.  As such, the term "*pressure sensor unit*" covers pressure sensor units as well as all equivalent units.

96.     The Patch Recorder is equivalent to a "*pressure sensor unit*", as recited in Independent Claim 1, at least because the Patch Recorder performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

97.   The storing of detected cardiac information is an example of a "***defense event***" as recited in Independent Claim 1.   Additionally, the transmission of captured cardiac information to a preselected entity (*e.g.,* the Monitoring Center) is an example of a "***defense event***", as recited in Independent Claim 1.

98.   Moreover, equivalents of the term "***defense event***", as recited in Independent Claim 1, were never sacrificed during prosecution of the Application within the USPTO.   As such, the term "***defense event***" covers defense events as well as all equivalent events.

99.   The storing of detected cardiac information is equivalent to a "***defense event***", as recited in Independent Claim 1, at least because the storing of detected cardiac information yields substantially the same result, as indicated herein.

100.   The transmission of captured cardiac information to a preselected entity is equivalent to a "***defense event***", as recited in Independent Claim 1, at least because the transmission of captured cardiac information to a preselected entity yields substantially the same result, as indicated herein.

101.   The Wireless Gateway is analogous to a "***defense unit***", as recited in Independent Claim 1, at least because the Wireless Gateway is configured to capture information pertaining to a user's pushing of the Trigger Button.

102.   The Wireless Gateway is also analogous to the "***defense unit***", as recited in Independent Claim 1, at least because the Wireless Gateway is configured to wirelessly route captured information (such as the cardiac data detected by the Patch Recorder as well as the captured information that pertains to a user's pushing of the Trigger Button).

103.   Moreover, equivalents of the term "***defense unit***", as recited in Independent Claim 1, were never sacrificed during prosecution of the Application within the USPTO.   As such, the term "***defense unit***" covers defense units as well as all equivalent units.

104.   The Wireless Gateway is equivalent to a "***defense unit***", as recited in

Independent Claim 1, at least because the Wireless Gateway performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

105. The Wireless Gateway is analogous to the "***defense unit coupled with said material***", as recited in Independent Claim 1, at least because the Wireless Gateway is physically housed within the Gateway Housing.

106. Additionally, the Wireless Gateway is analogous to the "***defense unit coupled with said material***", as recited in Independent Claim 1, at least because the Wireless Gateway is physically housed within the Gateway Housing (from which extends the External Clip).

107. Moreover, equivalents of the term "***coupled with said material***", as recited in Independent Claim 1, were never sacrificed during prosecution of the Application within the USPTO. As such, the term "***coupled with said material***" must be provided its broadest possible construction.

108. The Wireless Gateway is analogous to "***said defense unit integrated with a wireless receiver configured to wirelessly receive said pressure input signal from said wireless transmitter, and said defense unit configured to initiate a defense event based on said pressure input signal***", as recited in Independent Claim 1, at least because (i) the Wireless Gateway must be integrated with such a wireless receiver in order to be able to wirelessly receive information from the Patch Recorder and (ii) the Wireless Gateway is configured to initiate a defense event (*e.g.,* storing detected cardiac information or transmitting captured cardiac information to a preselected entity) based on the signal generated when the user pushes the Trigger Button.

109. Moreover, it is noted that equivalents of the terms "***initiate a defense event***" and "***based on said pressure input signal***", as recited in Independent Claim 1, were never sacrificed during prosecution of the Application within the USPTO. As such, the terms "***initiate a defense event***" and "***based on said pressure input***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*signal*" must be provided their broadest possible constructions.

**B.**   **Claim 2**

110.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

111.   Claim 2 of the Letters Patent recites, "***The self-defense system of claim 1, further comprising: a comparator communicatively associated with said defense unit, said comparator configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison, and said defense unit configured to initiate [sic] defense event based on said execution signal.***"

112.   Upon information and belief, the Trigger Button is integrated with circuitry configured to sense an applied pressure (such as where the user physically pushes the Trigger Button) and generate an electronic signal based on this applied pressure, wherein the generated electronic signal has a signal amplitude.

113.   Upon information and belief, the Patch Recorder contains circuitry capable of generating an execution signal when the signal amplitude of this generated electronic signal is above an absolute value or magnitude of a threshold voltage.   This circuitry is analogous to the "***comparator***" recited in Claim 2. Indeed, this circuitry is analogous to "***a comparator communicatively associated with said defense unit, said comparator configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison, and said defense unit configured to initiate [sic] defense event based on said execution signal***", as recited in Claim 2, at least because (i) the Patch Recorder, which contains this circuitry, is configured to wirelessly communicate information to the Wireless Gateway and (ii) this circuitry is capable of generating an execution signal when the signal amplitude of the generated electronic signal is above an absolute value or magnitude of a threshold voltage.

114.   Moreover, equivalents of the term "*comparator*", as recited in Claim 2, were never sacrificed during prosecution of the Application within the USPTO. As such, the term "*comparator*" covers comparators as well as all equivalent circuitry.

115.   The aforementioned circuitry capable of generating an execution signal when the signal amplitude of the generated electronic signal is above an absolute value or magnitude of a threshold voltage is equivalent to a "*comparator*", as recited in Claim 2, at least because this circuitry performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

116.   Indeed, equivalents of the language "*configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison*", as recited in Claim 2, were also never sacrificed during prosecution of the Application within the USPTO.   As such, the language "*configured to conduct a comparison of two electronic signals and generate an execution signal based on said comparison*" covers such a comparison as well as all equivalent operations.

117.   Generating an execution signal when the signal amplitude of the generated electronic signal is above an absolute value or magnitude of a threshold voltage is equivalent to "*conduct[ing] a comparison of two electronic signals and generate an execution signal based on said comparison*", as recited in Claim 2, at least because such an operation performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

118.   Finally, as previously noted, the Wireless Gateway is analogous to the claimed "*defense unit*".   Upon information and belief, the Wireless Gateway is configured to store detected cardiac information based on this execution signal.   Additionally, upon information and belief, the Wireless Gateway is configured to

wirelessly transmit such cardiac information to a preselected entity (the Monitoring Center) based on this execution signal.   As such, the Wireless Gateway is "*configured to initiate [sic] defense event based on said execution signal*", as recited in Claim 2.

119.   Moreover, it is noted that equivalents of the terms "*initiate [sic] defense event*" and "*based on said execution signal*", as recited in Claim 2, were never sacrificed during prosecution of the Application within the USPTO.   As such, the terms "*initiate [sic] defense event*" and "*based on said execution signal*" must be provided their broadest possible constructions.

## C.   Claim 3

120.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

121.   Claim 3 of the Letters Patent recites, "*The self-defense system of claim 2, wherein said defense unit comprises: a number of projector units each configured to project a substance based on said execution signal; and/or a number of conductive energy devices each comprising two electrodes and configured to generate a voltage differential between said electrodes based on said execution signal.*"

122.   Upon information and belief, the Wireless Gateway comprises at least one conductive energy device that comprises two electrodes.   A voltage differential is generated between the two electrodes, based on the execution signal generated by the circuitry of the Patch Recorder (discussed herein with respect to Claim 2), such that the Wireless Gateway performs a particular operation (*e.g.,* storing detected cardiac information or sending such cardiac information to the Monitoring Center) in response to the execution signal.   This at least one conductive energy device is therefore analogous to the "*number of conductive energy devices each comprising two electrodes and configured to generate a voltage differential*

*between said electrodes based on said execution signal*", as recited in Claim 3.

123.   Additionally, equivalents of the term "***conductive energy device[]***", as recited in Claim 3, were never sacrificed during prosecution of the Application within the USPTO.   As such, the term "***conductive energy device[]***" covers conductive energy devices as well as all equivalent devices.

124.   The aforementioned at least one conductive energy device of the Wireless Gateway is equivalent to "***a number of conductive energy devices***", as recited in Claim 3, at least because this circuitry performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

125.   Moreover, equivalents of the term "***voltage differential***", as recited in Claim 3, were never sacrificed during prosecution of the Application within the USPTO.   As such, the term "***voltage differential***" is not limited to any voltage range, but rather covers any voltage value.

126.   Furthermore, it is noted that equivalents of the term "***based on said execution signal***", as recited in Claim 3, were never sacrificed during prosecution of the Application within the USPTO.   As such, the term "***based on said execution signal***" must be provided its broadest possible construction.

**D.   Claim 4**

127.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

128.   Claim 4 of the Letters Patent recites, "***The self-defense system of claim 1, further comprising: one or more armor units coupled with said material and sized to conform to a shape of said appendage.***"

129.   The Front External Cover of the Wireless Gateway Device is analogous to "***said material***", as recited in Claim 4, while the Back External Cover of the Wireless Gateway Device is analogous to the "***one or more armor units***

*coupled with said material and sized to conform to a shape of said appendage*", as recited in Claim 4. Alternatively, the Back External Cover of the Wireless Gateway Device is analogous to "*said material*", as recited in Claim 4, while the Front External Cover of the Wireless Gateway Device is analogous to the "*one or more armor units coupled with said material and sized to conform to a shape of said appendage*", as recited in Claim 4. As previously noted, the Front External Cover is moveably coupled with the Back External Cover by first and second Hinges. Moreover, upon information and belief, each of these covers has a physical rigidity that enables said covers to protect one or more components housed within the Gateway Housing.

130. The foregoing notwithstanding, the Gateway Housing (or the Front External Cover or the Back External Cover of the Gateway Housing) is analogous to "*said material*", as recited in Claim 4, while the External Clip of the Wireless Gateway Device is analogous to the "*one or more armor units coupled with said material and sized to conform to a shape of said appendage*", as recited in Claim 4. Upon information and belief, the External Clip has a size and physical rigidity that enables it to protect at least a portion of an object that it wraps around. Alternatively, the External Clip of the Wireless Gateway Device is analogous to "*said material*", as recited in Claim 4, while the Gateway Housing (or the Front External Cover or the Back External Cover of the Gateway Housing) is analogous to the "*one or more armor units coupled with said material and sized to conform to a shape of said appendage*", as recited in Claim 4. With respect to the "*coupled with*" language, it is noted that the External Clip physically extend from the Gateway Housing.

131. Moreover, equivalents of the term "*armor units*", as recited in Claim 4, were never sacrificed during prosecution of the Application within the USPTO. As such, the term "*armor units*" covers armor units as well as all equivalent devices.

132.   The Gateway Housing (or the Front External Cover or the Back External Cover of the Gateway Housing) is equivalent to an "***armor unit[]***", as recited in Claim 4, at least because such component performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

133.   Additionally, the External Clip is equivalent to an "***armor unit[]***", as recited in Claim 4, at least because the External Clip performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

134.   Furthermore, it is noted that equivalents of the language "***armor unit[] … sized to conform to a shape of said appendage***", as recited in Claim 4, were never sacrificed during prosecution of the Application within the USPTO.   As such, the language "***armor unit[] … sized to conform to a shape of said appendage***" covers units sized to conform to an appendage as well as all equivalent units.

135.   The Gateway Housing (or the Front External Cover or the Back External Cover of the Gateway Housing) is equivalent to an "***armor unit[] … sized to conform to a shape of said appendage***", as recited in Claim 4, at least because such component performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

136.   Additionally, the External Clip is equivalent to an "***armor unit[] … sized to conform to a shape of said appendage***", as recited in Claim 4, at least because the External Clip performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

**E.**   **Claim 5**

137.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

138.   Claim 5 of the Letters Patent recites, "*The self-defense system of claim 1, further comprising: one or more pressure sensors communicatively associated with said pressure sensor unit, each of said one or more pressure sensors configured to sense an applied pressure and generate a pressure input signal based on said applied pressure, and each of said one or more pressure input signals having a signal amplitude; and a comparator communicatively associated with said one or more pressure sensors, said comparator configured to compare said one more pressure input signals with a threshold voltage and generate an automatic execution signal in response to an absolute value or magnitude of at least one of said one or more signal amplitudes being above an absolute value or magnitude of said threshold voltage, and said defense unit configured to initiate said defense event based on said automatic execution signal.*"

139.   Upon information and belief, the Trigger Button is integrated with circuitry configured to sense an applied pressure (such as where the user physically pushes the Trigger Button) and generate a pressure input signal based on this applied pressure, wherein the generated pressure input signal has a signal amplitude.  The Trigger Button along with this integrated circuitry is analogous to the "*one or more pressure sensors*" recited in Claim 5.  Indeed, the Trigger Button along with this integrated circuitry is analogous to "*one or more pressure sensors communicatively associated with said pressure sensor unit, each of said one or more pressure sensors configured to sense an applied pressure and generate a pressure input signal based on said applied pressure*", as recited in Claim 5, at least because (i) the Trigger Button and this integrated circuitry are communicatively associated with the Patch Recorder (wherein the Patch Recorder is analogous to "*said pressure sensor unit*") and (ii) this circuitry is configured to sense an applied pressure (such as where the user physically pushes the Trigger Button) and generate a pressure input signal based on this applied pressure.

Moreover, this generated pressure input signal having a signal amplitude is analogous to "***each of said one or more pressure input signals having a signal amplitude***", as recited in Claim 5.

140. Additionally, equivalents of the term "***pressure sensors***", as recited in Claim 5, were never sacrificed during prosecution of the Application within the USPTO. As such, the term "***pressure sensors***" covers pressure sensors as well as all equivalent devices.

141. The aforementioned Trigger Button along with said integrated circuitry is equivalent to a "***pressure sensor[]***", as recited in Claim 5, at least because this Trigger Button along with said integrated circuitry performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

142. Upon information and belief, the Patch Recorder contains circuitry capable of generating an automatic execution signal when the signal amplitude of the generated pressure input signal is above an absolute value or magnitude of a threshold voltage. This circuitry is analogous to the "***comparator***" recited in Claim 5. Indeed, this circuitry is analogous to "***a comparator communicatively associated with said one or more pressure sensors, said comparator configured to compare said one more pressure input signals with a threshold voltage and generate an automatic execution signal in response to an absolute value or magnitude of at least one of said one or more signal amplitudes being above an absolute value or magnitude of said threshold voltage***", as recited in Claim 5, at least because this circuitry, which is included within the Patch Recorder, is capable of generating an automatic execution signal when the signal amplitude of the generated pressure input signal is above an absolute value or magnitude of a threshold voltage.

143. Moreover, equivalents of the term "***comparator***", as recited in Claim 5, were never sacrificed during prosecution of the Application within the USPTO.

As such, the term "*comparator*" covers comparators as well as all equivalent devices.

144.   The aforementioned circuitry capable of generating an automatic execution signal when the signal amplitude of the generated pressure input signal is above an absolute value or magnitude of a threshold voltage is equivalent to a "*comparator*", as recited in Claim 5, at least because this circuitry performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

145.   Finally, as previously noted, the Wireless Gateway is analogous to the claimed "*defense unit*".   Upon information and belief, the Wireless Gateway is configured to store detected cardiac information based on this automatic execution signal.   Additionally, upon information and belief, the Wireless Gateway is configured to wirelessly transmit such cardiac information to a preselected entity (the Monitoring Center) based on this execution signal.   As such, the Wireless Gateway is "*configured to initiate said defense event based on said automatic execution signal*", as recited in Claim 5.

146.   Moreover, it is noted that equivalents of the terms "*initiate said defense event*" and "*based on said automatic execution signal*", as recited in Claim 5, were never sacrificed during prosecution of the Application within the USPTO.   As such, the terms "*initiate said defense event*" and "*based on said automatic execution signal*" must be provided their broadest possible constructions.

**F.**   <u>**Claim 8**</u>

147.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

148.   Claim 8 of the Letters Patent recites, "*The self-defense system of claim 1, further comprising: a manual selector communicatively associated with*

1   *said defense unit and configured to generate a manual execution signal in*
2   *response to a selection of said manual selector, said defense unit configured to*
3   *initiate said defense event based on said manual execution signal.*"

4   149.   Upon information and belief, the Star Button is integrated with
5   circuitry of the Wireless Gateway.  Additionally, upon information and belief, a
6   selection of the Star Button (*e.g.,* when a user pushes the Star Button) causes said
7   circuitry to generate an electronic signal that causes the Wireless Gateway to
8   establish a Bluetooth connection between the Wireless Gateway and the Patch
9   Recorder.  The Star Button and said circuitry are analogous to "*a manual selector*
10  *communicatively associated with said defense unit and configured to generate a*
11  *manual execution signal in response to a selection of said manual selector,*" as
12  recited in Claim 8, at least because (i) the Star Button and said circuitry are
13  communicatively associated with the Wireless Gateway (wherein the Wireless
14  Gateway is analogous to the "*defense unit*") and (ii) a selection of the Star Button
15  (*e.g.,* when a user pushes the Star Button) causes said circuitry to generate an
16  electronic signal that causes the Wireless Gateway to establish a Bluetooth
17  connection between the Wireless Gateway and the Patch Recorder.  Moreover, the
18  Wireless Gateway is analogous to "*said defense unit configured to initiate said*
19  *defense event based on said manual execution signal*", as recited in Claim 8, at
20  least because the Wireless Gateway is capable of initiating a defense event (*e.g.,*
21  storing cardiac information that the Wireless Gateway receives from the Patch
22  Recorder or transmitting such information to a preselected entity) when a
23  Bluetooth connection is established between the Wireless Gateway and the Patch
24  Recorder, wherein such connection is established based on the electronic signal
25  generated by said circuitry when the Star Button is pushed.

26  150.   The foregoing notwithstanding, upon information and belief, the
27  Airplane Button is integrated with circuitry of the Wireless Gateway.
28  Additionally, upon information and belief, a selection of the Airplane Button (*e.g.,*

when a user pushes the Airplane Button) when the Wireless Gateway is in a cellular signal non-transmission mode (Airplane Mode) causes said circuitry to generate an electronic signal that then causes a current operating mode of the Wireless Gateway to change to a cellular signal transmission mode.  The Airplane Button and said circuitry are analogous to "***a manual selector communicatively associated with said defense unit and configured to generate a manual execution signal in response to a selection of said manual selector,***" as recited in Claim 8, at least because (i) the Airplane Button and said circuitry are communicatively associated with the Wireless Gateway (wherein the Wireless Gateway is analogous to the "***defense unit***") and (ii) a selection of the Airplane Button (*e.g.,* when a user pushes the Airplane Button) when the Wireless Gateway is in a cellular signal non-transmission mode (Airplane Mode) causes said circuitry to generate an electronic signal that then causes a current operating mode of the Wireless Gateway to change to a cellular signal transmission mode.  Moreover, the Wireless Gateway is analogous to "***said defense unit configured to initiate said defense event based on said manual execution signal***", as recited in Claim 8, at least because the Wireless Gateway is capable of initiating a defense event (*e.g.,* transmitting cardiac information that the Wireless Gateway receives from the Patch Recorder to a preselected entity) when a current operating mode of the Wireless Gateway changes from a cellular signal non-transmission mode (Airplane Mode) to a cellular signal transmission mode, wherein such operating mode change occurs based on the electronic signal generated by said circuitry as a result of the Airplane Button being pushed when the Wireless Gateway is in a cellular signal non-transmission mode (Airplane Mode).

151.  Moreover, equivalents of the term "***manual selector***", as recited in Claim 8, were never sacrificed during prosecution of the Application within the USPTO.  As such, the term "***manual selector***" covers manual selectors as well as all equivalent selectors.

152.   The Star Button and the aforementioned circuitry integrated with the Star Button are equivalent to a "*manual selector*", as recited in Claim 8, at least because the Star Button and said circuitry perform substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

153.   The Airplane Button and the aforementioned circuitry integrated with the Airplane Button are equivalent to a "*manual selector*", as recited in Claim 8, at least because the Airplane Button and said circuitry perform substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

154.   Moreover, it is noted that equivalents of the terms "*initiate said defense event*" and "*based on said manual execution signal*", as recited in Claim 8, were never sacrificed during prosecution of the Application within the USPTO. As such, the terms "*initiate said defense event*" and "*based on said manual execution signal*" must be provided their broadest possible constructions.

## G.   Claim 9

155.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

156.   Claim 9 of the Letters Patent recites, "*The self-defense system of claim 1, wherein said defense unit comprises: a conductive energy device comprising two electrodes, said conductive energy device configured to generate a voltage differential between said electrodes based on said pressure input signal.*"

157.   As previously mentioned above, pushing the Trigger Button causes the Patch Recorder to wirelessly transmit, using the Bluetooth connection, a signal to the Wireless Gateway.  This signal causes a voltage generated by the Battery Unit to be applied to circuitry within the Wireless Gateway, which in turn causes

the Wireless Gateway to send cardiac information to the Monitoring Center. Indeed, a voltage differential must be generated between two electrodes (which are electrical conductors) of this circuitry within the Wireless Gateway, based on the signal generated when the user pushes the Trigger Button, in order for the Wireless Gateway to perform any type of operation (*e.g.,* sending cardiac information to the Monitoring Center) in response to the signal generated when the user pushes the Trigger Button.  This circuitry is therefore analogous to "***a conductive energy device comprising two electrodes, said conductive energy device configured to generate a voltage differential between said electrodes based on said pressure input signal***", as recited in Claim 9.

158.   Moreover, equivalents of the term "***conductive energy device***", as recited in Claim 9, were never sacrificed during prosecution of the Application within the USPTO.   As such, the term "***conductive energy device***" covers conductive energy devices as well as all equivalent devices.

159.   The aforementioned circuitry within the Wireless Gateway is equivalent to a "***conductive energy device***", as recited in Claim 9, at least because this circuitry performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

160.   Moreover, it is noted that equivalents of the terms "***generate a voltage differential between said electrodes***" and "***based on said pressure input signal***", as recited in Claim 9, were never sacrificed during prosecution of the Application within the USPTO.   As such, the terms "***generate a voltage differential between said electrodes***" and "***based on said pressure input signal***" must be provided their broadest possible constructions.

## H.   Claim 13

161.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

162.   Claim 13 of the Letters Patent recites, "***The self-defense system of claim 1, further comprising: an image input unit communicatively associated with said pressure sensor unit, said image input unit configured to capture image data as a result of said pressure input signal.***"

163.   Upon information and belief, the Patch Recorder is integrated with a Data Capturing Unit configured to capture symptom-related data (*e.g.,* the Patient Trigger Mark) in response to the user pressing the Trigger Button, wherein this symptom-related information is utilized at the Monitoring Center to generate an image of ECG data, such as, for example, in a 2-dimensional (2D) graphical format (*e.g.,* heart rate versus time).  This Data Capturing Unit is analogous to "***an image input unit communicatively associated with said pressure sensor unit, said image input unit configured to capture image data as a result of said pressure input signal***", as recited in Claim 13, at least because (i) the Data Capturing Unit is integrated with the Patch Recorder, (ii) the captured symptom-related data is analogous to the claimed "***image data***" at least because this information is utilized to generate an image of ECG data and (iii) the symptom-related data is captured by the Data Capturing Unit as a result of the Electronic Trigger Signal, which is generated by the Patch Circuitry when the Trigger Button is pressed.

164.   Additionally, equivalents of the term "***image input unit***", as recited in Claim 13, were never sacrificed during prosecution of the Application within the USPTO.  As such, the term "***image input unit***" covers image input units as well as all equivalent units.

165.   The Data Capturing Unit is equivalent to an "***image input unit***", as recited in Claim 13, at least because the Data Capturing Unit performs substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

166.   Moreover, equivalents of the term "***image data***", as recited in Claim 13, were never sacrificed during prosecution of the Application within the USPTO.

As such, the term "*image data*" covers image data as well as all equivalent data.

167.   The aforementioned captured symptom-related data is equivalent to "*image data*", as recited in Claim 13, at least because such captured symptom-related data is utilized to perform substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

168.   Furthermore, it is noted that equivalents of the terms "*capture image data*" and "*as a result of said pressure input signal*", as recited in Claim 13, were never sacrificed during prosecution of the Application within the USPTO.   As such, the terms "*capture image data*" and "*as a result of said pressure input signal*" must be provided their broadest possible constructions.

## I.   <u>Claim 16</u>

169.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

170.   Claim 16 of the Letters Patent recites, "*The self-defense system of claim 1, further comprising: an audio output unit communicatively associated with said pressure sensor unit, said audio output unit configured to access preselected audio data based on said pressure input signal, and said audio output unit further configured to generate and output and [sic] audio signal based on or associated with said preselected audio data.*"

171.   Upon information and belief, the Transducer of the Wireless Gateway is capable of generating a sound based on an electronic input, and the Wireless Gateway includes circuitry integrated with the Transducer that is configured to provide a particular electronic signal to the Transducer such that the Transducer can translate this electronic signal into a sound wave that is propagated through the air.   The Transducer and said circuitry is analogous to the "*audio output unit communicatively associated with said pressure sensor unit, said audio output unit configured to access preselected audio data based on said pressure input*"

*signal, and said audio output unit further configured to generate and output and [sic] audio signal based on or associated with said preselected audio data*", as recited in Claim 16, at least because (i) the Wireless Gateway is communicatively associated with the Patch Recorder, (ii) the aforementioned electronic signal that is received by the Transducer is analogous to the claimed "***preselected audio data***" at least because this signal is preselected to cause the Transducer to emit sound at a particular audible frequency and (iii) the Transducer generates a sound based on this electronic signal (*e.g.,* by translating this electronic signal into an audible sound).

172.   Additionally, equivalents of the term "***audio output unit***", as recited in Claim 16, were never sacrificed during prosecution of the Application within the USPTO.  As such, the term "***audio output unit***" covers audio output units as well as all equivalent units.

173.   The Transducer, along with the aforementioned circuitry integrated therewith, are equivalent to an "***audio output unit***", as recited in Claim 16, at least because the Transducer and said integrated circuitry perform substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

174.   Moreover, equivalents of the term "***preselected audio data***", as recited in Claim 16, were never sacrificed during prosecution of the Application within the USPTO.  As such, the term "***preselected audio data***" covers preselected audio data as well as all equivalent data.

175.   The aforementioned electronic signal that is received by the Transducer is equivalent to "***preselected audio data***", as recited in Claim 16, at least because this electronic signal is utilized to perform substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

176.   Furthermore, it is noted that equivalents of the terms "***access***

*preselected audio data*" and "*based on said pressure input signal*", as recited in Claim 16, were never sacrificed during prosecution of the Application within the USPTO.  As such, the terms "*access preselected audio data*" and "*based on said pressure input signal*" must be provided their broadest possible constructions.

177.  Finally, it is noted that equivalents of the terms "*generate and output and [sic] audio signal*" and "*based on or associated with said preselected audio data*", as recited in Claim 16, were never sacrificed during prosecution of the Application within the USPTO.  As such, the terms "*generate and output and [sic] audio signal*" and "*based on or associated with said preselected audio data*" must be provided their broadest possible constructions.

**J.   Claim 17**

178.  Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

179.  Independent Claim 17 of the Letters Patent recites, "*A self-defense system comprising: a material sized to conform to an appendage; a pressure sensor unit integrated with a wireless transmitter, said pressure sensor unit configured to generate a pressure input signal; ... and a defense unit coupled with said material ..., said defense unit integrated with a wireless receiver configured to wirelessly receive said pressure input signal from said wireless transmitter ....*"  These features were discussed above with respect to Independent Claim 1.  All statements and allegations presented herein for these features with respect to Independent Claim 1 are hereby incorporated by reference with respect to Independent Claim 17.

180.  Independent Claim 17 of the Letters Patent also recites, "*a manual selector configured to generate a manual execution signal; and a defense unit ... communicatively associated with said manual selector, ... said defense unit configured to initiate a defense event in response to either of said pressure input*"

*and manual execution signals.*"

181.  Upon information and belief, the Star Button is integrated with circuitry of the Wireless Gateway.  Additionally, upon information and belief, a selection of the Star Button (*e.g.,* when a user pushes the Star Button) causes said circuitry to generate an electronic signal that causes the Wireless Gateway to establish a Bluetooth connection between the Wireless Gateway and the Patch Recorder.  The Star Button and said circuitry are analogous to "*a manual selector configured to generate a manual execution signal*", as recited in Independent Claim 17, at least because a selection of the Star Button (*e.g.,* when a user pushes the Star Button) causes said circuitry to generate an electronic signal that causes the Wireless Gateway to establish a Bluetooth connection between the Wireless Gateway and the Patch Recorder.  Moreover, the Wireless Gateway is analogous to "*a defense unit ... communicatively associated with said manual selector, ... said defense unit configured to initiate a defense event in response to either of said pressure input and manual execution signals*", as recited in Independent Claim 17, at least because (i) the Wireless Gateway is communicatively associated with the Star Button and said circuitry, (ii) the Wireless Gateway is configured to initiate a defense event (*e.g.,* storing cardiac information that the Wireless Gateway receives from the Patch Recorder or transmitting such information to a preselected entity) in response to the signal generated when the user pushes the Trigger Button and (iii) the Wireless Gateway is capable of initiating a defense event (*e.g.,* storing cardiac information that the Wireless Gateway receives from the Patch Recorder or transmitting such information to a preselected entity) when a Bluetooth connection is established between the Wireless Gateway and the Patch Recorder, wherein such connection is established in response to the electronic signal generated by said circuitry when the Star Button is pushed.

182.  The foregoing notwithstanding, upon information and belief, the Airplane Button is integrated with circuitry of the Wireless Gateway.

Additionally, upon information and belief, a selection of the Airplane Button (*e.g.,* when a user pushes the Airplane Button) when the Wireless Gateway is in a cellular signal non-transmission mode (Airplane Mode) causes said circuitry to generate an electronic signal that then causes a current operating mode of the Wireless Gateway to change to a cellular signal transmission mode.  The Airplane Button and said circuitry are analogous to "***a manual selector configured to generate a manual execution signal***", as recited in Independent Claim 17, at least because a selection of the Airplane Button (*e.g.,* when a user pushes the Airplane Button) when the Wireless Gateway is in a cellular signal non-transmission mode (Airplane Mode) causes said circuitry to generate an electronic signal that then causes a current operating mode of the Wireless Gateway to change to a cellular signal transmission mode.  Moreover, the Wireless Gateway is analogous to "***a defense unit ... communicatively associated with said manual selector, ... said defense unit configured to initiate a defense event in response to either of said pressure input and manual execution signals***", as recited in Independent Claim 17, at least because (i) the Wireless Gateway is communicatively associated with the Airplane Button and said circuitry, (ii) the Wireless Gateway is configured to initiate a defense event (*e.g.,* storing cardiac information that the Wireless Gateway receives from the Patch Recorder or transmitting such information to a preselected entity) in response to the signal generated when the user pushes the Trigger Button and (iii) the Wireless Gateway is capable of initiating a defense event (*e.g.,* transmitting cardiac information that the Wireless Gateway receives from the Patch Recorder to a preselected entity) when a current operating mode of the Wireless Gateway changes from a cellular signal non-transmission mode (Airplane Mode) to a cellular signal transmission mode, wherein such operating mode change occurs in response to the electronic signal generated by said circuitry as a result of the Airplane Button being pushed when the Wireless Gateway is in a cellular signal non-transmission mode (Airplane Mode).

183.   Moreover, equivalents of the term "***manual selector***", as recited in Independent Claim 17, were never sacrificed during prosecution of the Application within the USPTO.  As such, the term "***manual selector***" covers manual selectors as well as all equivalent selectors.

184.   The Star Button and the aforementioned circuitry integrated with the Star Button are equivalent to a "***manual selector***", as recited in Independent Claim 17, at least because the Star Button and said circuitry perform substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

185.   The Airplane Button and the aforementioned circuitry integrated with the Airplane Button are equivalent to a "***manual selector***", as recited in Independent Claim 17, at least because the Airplane Button and said circuitry perform substantially the same function, in substantially the same way, to yield substantially the same result, as indicated herein.

186.   Moreover, it is noted that equivalents of the terms "***initiate a defense event***" and "***in response to either of said pressure input and manual execution signals***", as recited in Independent Claim 17, were never sacrificed during prosecution of the Application within the USPTO.  As such, the terms "***initiate a defense event***" and "***in response to either of said pressure input and manual execution signals***" must be provided their broadest possible constructions.

## IV.   <u>Induced Infringement.</u>

187.   Defendant, through its own actions in connection with the Zio AT System, has for a long time past and still is inducing others to infringe the Letters Patent, in violation of 35 U.S.C. § 271(b), and will continue to do so unless enjoined by this Court.

188.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

189.   Third party users (*e.g.,* Defendant's customers) of the Zio AT System, by using, within the United States, the Zio AT System, have for a long time past and still are directly infringing Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent, in violation of 35 U.S.C. § 271(a), for at least the same rationale presented herein with respect to Defendant's use of the Zio AT System with respect to such claims. Additionally, Defendant induces, in violation of 35 U.S.C. § 271(b), this direct infringement by such third party users for at least the following rationale.

190.   With respect to Independent Claims 1 and 17, upon information and belief, Defendant informs users how to carry the Wireless Gateway Device in the Mobile Carrier (*e.g.,* a purse or bag) while the user wears the Patch Recorder.  *See, e.g.,* Exhibit L at page 8 (wherein Defendant informs users of the ZIO AT System that users "[c]an [] carry the gateway in a purse, bag or pocket").  *See also, e.g.,* Exhibit L at page 4 (wherein Defendant's user manual for the Zio AT System includes an illustration showing a user carrying the Wireless Gateway Device in the Mobile Carrier).  The Mobile Carrier includes a Strap that fits around a user's arm such that the user can carry the Mobile Carrier, and the Wireless Gateway Device positioned therein, while the user is on the move.  *See, e.g.,* Exhibit L at page 4 (illustrating that the Strap is positioned around a user's arm such that the user can carry the Mobile Carrier, and the Wireless Gateway Device positioned therein, while the user is on the move).  The Mobile Carrier is analogous to the "***material sized to conform to an appendage***", as recited in Independent Claims 1 and 17, at least because, upon information and belief, the Mobile Carrier is sized to conform to a user's arms.  For example, the Strap of the Mobile Carrier conforms to a contour of a user's arm when the Strap is positioned around the user's arm such that the user can carry the Mobile Carrier, and the Wireless Gateway Device positioned therein, while the user is on the move.  The Wireless Gateway is analogous to the "***defense unit coupled with said material***", as recited in Independent Claims 1 and 17, at least because (i) the Wireless Gateway is

physically held within the Mobile Carrier and (ii) the Wireless Gateway functions to initiate a "*defense event*", as previously discussed herein.

191.   Additionally, with respect to Independent Claims 1 and 17, upon information and belief, Defendant informs users that the Wireless Gateway Device can be carried in the users' clothing pockets.   *See, e.g.,* Exhibit L at page 8 (wherein Defendant informs users of the ZIO AT System that users "[c]an [] carry the gateway in a purse, bag or pocket").   Upon information and belief, such clothing pockets include, for example, (i) pant clothing pockets (*e.g.,* cargo pant leg pockets) and (ii) shirt, sweatshirt, jacket and coat clothing pockets.   Such pocketed clothing is analogous to the "*material sized to conform to an appendage*", as recited in Independent Claims 1 and 17, at least because, upon information and belief, the pocketed clothing is sized to conform to the user's legs or arms.   For example, the pocketed clothing conforms to a contour of a user's leg or arm when the pocketed clothing is worn by the user such that the user can carry the Wireless Gateway Device within a pocket of such pocketed clothing while the user is on the move.   The Wireless Gateway is analogous to the "*defense unit coupled with said material*", as recited in Independent Claims 1 and 17, at least because (i) the Wireless Gateway is physically held within the Mobile Carrier and (ii) the Wireless Gateway functions to initiate a "*defense event*", as previously discussed herein.

192.   Moreover, with respect to Independent Claims 1 and 17, upon information and belief, the External Clip of the Wireless Gateway Device is capable of extending around a user's belt to thereby hold the Wireless Gateway Device to the user's belt.   *See, e.g.,* Exhibit L at page 8, referring to the External Clip as a "belt clip".   *See also, e.g.,* Exhibit K at page 3.   Upon information and belief, the user may wrap and secure this belt around, for example, the user's waist, leg, arm or hand.   The belt is analogous to the "*material sized to conform to an appendage*", as recited in Independent Claims 1 and 17, at least because, upon

information and belief, the belt is sized to conform to the user's leg, arm or hand. For example, the belt is capable of conforming to a contour of a user's leg, arm or hand when the belt is secured around the user's leg, arm or hand such that the user can carry the belt, as well as the Wireless Gateway Device attached thereto as a result of the External Clip securing the Wireless Gateway Device to the belt, on the user's leg, arm or hand while the user is on the move.  The Wireless Gateway is analogous to the "*defense unit coupled with said material*", as recited in Independent Claims 1 and 17, at least because (i) the Wireless Gateway is physically secured to the belt when the External Clip of the Wireless Gateway Device extends around the belt to thereby hold the Wireless Gateway Device to the belt and (ii) the Wireless Gateway functions to initiate a "*defense event*", as previously discussed herein.

193.   Furthermore, upon information and belief, the External Clip is also capable of extending around, for example, a user's sock, armband or glove to thereby hold the Wireless Gateway Device to, for example, the user's leg, arm or hand.  The sock, armband or glove is analogous to the "*material sized to conform to an appendage*", as recited in Independent Claims 1 and 17, at least because, upon information and belief, the sock, armband or glove is sized to conform to the user's leg, arm or hand.  For example, the sock, armband or glove is capable of conforming to a contour of a user's leg, arm or hand when the sock, armband or glove is secured around the user's leg, arm or hand such that the user can carry the sock, armband or glove, as well as the Wireless Gateway Device attached thereto as a result of the External Clip securing the Wireless Gateway Device to the sock, armband or glove, on the user's leg, arm or hand while the user is on the move. The Wireless Gateway is analogous to the "*defense unit coupled with said material*", as recited in Independent Claims 1 and 17, at least because (i) the Wireless Gateway is physically secured to the sock, armband or glove when the External Clip of the Wireless Gateway Device extends around the sock, armband

or glove to thereby hold the Wireless Gateway Device to the sock, armband or glove and (ii) the Wireless Gateway functions to initiate a "*defense event*", as previously discussed herein.

194. With respect to Claims 2-5, 8, 9, 13 and 16, these claims depend from Independent Claim 1 and therefore include the features of Independent Claim 1.

195. Defendant induces users of the Zio AT System to perform acts, within the United States, that directly infringe Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent by: (i) taking action, during the time that the Letters Patent are in force (and with the intention of causing the infringing acts), to show users how to carry the Wireless Gateway Device in the Mobile Carrier (*e.g.,* a purse or bag) while the user wears the Patch Recorder, and to operate the Monitoring Center and provide the Zio Service in the manner mentioned herein; and (ii) currently being aware of the Letters Patent and knowing that the acts, if taken, would constitute infringement of Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent.

196. Additionally, Defendant induces users of the Zio AT System to perform acts, within the United States, that directly infringe Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent by: (i) taking action, during the time that the Letters Patent are in force (and with the intention of causing the infringing acts), to informs users that the Wireless Gateway Device can be carried in the users' clothing pockets, and to operate the Monitoring Center and provide the Zio Service in the manner mentioned herein; and (ii) currently being aware of the Letters Patent and knowing that the acts, if taken, would constitute infringement of Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent.

197. Moreover, Defendant induces users of the Zio AT System to perform acts, within the United States, that directly infringe Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent by: (i) taking action, during the time that the Letters Patent are in force (and with the intention of causing the infringing acts), to size the External Clip of the Wireless Gateway Device such that the External Clip is capable of

extending around a user's belt to thereby hold the Wireless Gateway Device to the user's belt, to inform users that the Wireless Gateway Device has a belt clip, and to operate the Monitoring Center and provide the Zio Service in the manner mentioned herein; and (ii) currently being aware of the Letters Patent and knowing that the acts, if taken, would constitute infringement of Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent.

198. Furthermore, Defendant induces users of the Zio AT System to perform acts, within the United States, that directly infringe Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent by: (i) taking action, during the time that the Letters Patent are in force (and with the intention of causing the infringing acts), to size the External Clip of the Wireless Gateway Device such that the External Clip is capable of extending around, for example, a user's sock, armband or glove to thereby hold the Wireless Gateway Device to, for example, the user's leg, arm or hand, and to operate the Monitoring Center and provide the Zio Service in the manner mentioned herein; and (ii) currently being aware of the Letters Patent and knowing that the acts, if taken, would constitute infringement of Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent.

199. In addition to the foregoing, it is hereby noted that Defendant provides users of the Zio AT System with at least the following:

- the Patch Monitor;
- the Wireless Gateway;
- a skin preparation kit containing:
  - i. a patch card template,
  - ii. a disposable razor,
  - iii. an abrader disc, and
  - iv. four (4) alcohol wipes;
- an adhesive remover wipe;
- printed instructions for applying the Patch Monitor;

- printed information about the Zio AT System;
- a manual that contains information about wearing the Patch Monitor and that includes a button press log;
- a patient consent form;
- a patient survey; and
- a postage-paid return envelope.

*See* Exhibit S at page 6.  Upon information and belief, Defendant induces users of the Zio AT System to perform acts, within the United States, that directly infringe Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent by: (i) taking action, during the time that the Letters Patent are in force (and with the intention of causing the infringing acts), to provide users of the Zio AT System with the aforementioned items listed in this paragraph while also operating the Monitoring Center and providing the Zio Service in the manner mentioned herein; and (ii) currently being aware of the Letters Patent and knowing that the acts, if taken, would constitute infringement of Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent.

## V.   **Contributory Infringement.**

200.   Defendant, through its own actions in connection with the Zio AT System, has for a long time past and still is contributing to the direct infringement of the Letters Patent by others, in violation of 35 U.S.C. § 271(c), and will continue to do so unless enjoined by this Court.

201.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

202.   Third party users (*e.g.,* Defendant's customers) of the Zio AT System, by using, within the United States, the Zio AT System, have for a long time past and still are directly infringing Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent, in violation of 35 U.S.C. § 271(a), for at least the same rationale presented herein with respect to Defendant's use of the Zio AT System with respect to such claims.

Additionally, Defendant contributes, in violation of 35 U.S.C. § 271(c), to this direct infringement by such third party users for at least the following rationale.

203.   Defendant contributes to a use, within the United States, of the Zio AT System, by users of the Zio AT System, wherein such use directly infringes Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent, by (i) currently making, selling and offering to sell, within the United States, the Patch Recorder and the Wireless Gateway Device, both of which constitute material parts of the invention protected by the Letters Patent and have no substantial, non-infringing use, (ii) currently selling and offering to sell, within the United States, the Zio Service, (iii) currently operating the Monitoring Center and providing the Zio Service in the manner mentioned herein (iv) currently having actual knowledge of the Letters Patent and (v) currently knowing that the Patch Recorder and the Wireless Gateway Device have no other substantial, non-infringing use, or are otherwise especially made or especially adapted for use in an infringement of Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent.

**VI. <u>Additional Information.</u>**

204.   Plaintiff respectfully submits that it has, through its counsel, conducted a reasonable pre-suit analysis sufficient to plead a claim to relief with regard to Claims 1-5, 8, 9, 13, 16 and 17 of the Letters Patent that is plausible on its face, as demonstrated herein.

205.   Defendant currently possesses information sufficient to enable Plaintiff, through its counsel, to perform an analysis of the infringing instrumentality beyond the aforementioned investigation.   Defendant has not yet provided Plaintiff with access to information sufficient to allow Plaintiff to assess the applicability of Claims 6, 7, 10-12, 14 and 15 of the Letters Patent to the present action.   As such, Plaintiff expressly reserves the right to assert Claims 6, 7, 10-12, 14 and 15 of the Letters Patent against Defendant at a later date.

206.   Defendant currently possesses information sufficient to enable

Plaintiff, through its counsel, to perform an analysis of other instrumentalities that may be applicable to the present action.  Defendant has not yet provided Plaintiff with access to information sufficient to allow Plaintiff to assess the applicability of the claims of the Letters Patent to such other potentially infringing instrumentalities.  As such, Plaintiff expressly reserves the right to assert claims of the Letters Patent against Defendant at a later date based on one or more of such other instrumentalities.

207.  Defendant has also not yet provided Plaintiff with access to information sufficient to allow Plaintiff to assess the quality of the products and services pertaining to the infringing instrumentality.  Plaintiff respectfully submits that the marketing and sale of a low-quality implementation of the patented invention would degrade the value of the Letters Patent and cause irreparable harm to Plaintiff.

**VII. <u>Remedies.</u>**

208.  Plaintiff hereby seeks remedy by civil action for infringement of the Letters Patent in accordance with 35 U.S.C. § 281, and Plaintiff respectfully submits that such action is proper.

209.  Plaintiff hereby seeks a permanent injunction against infringement of the Letters Patent in accordance with 35 U.S.C. § 283, and Plaintiff respectfully submits that such injunctive relief is proper in this action at least because Plaintiff would suffer irreparable harm if injunctive relief is not granted, there is a lack of an adequate remedy at law, the balance of equities favors Plaintiff, and an injunction will serve the public interest.

210.  Plaintiff hereby seeks damages in accordance with 35 U.S.C. § 284, and Plaintiff respectfully submits that such damages are proper in this action.

211.  While the "the most frequently negotiated royalty term is 5% of sales", and while this royalty rate of 5 percent of sales "is found across a diverse number of industries including … communications, … defense, … electronics, …

[and] medical" (Exhibit AW at pages 2 and 3), upon information and belief, the standard royalty rate in the "Healthcare Products / Equipment" industry is 6.4 percent of sales (*see* Exhibit AX at page 4) while the average royalty rate for patent licenses in the high technology sector in general is 5.73 percent of sales (*see* Exhibit AV at page 4). *See also, e.g.,* Exhibit AW at page 2 (stating that the most frequently negotiated royalty terms are calculated as a percentage "of sales"). Plaintiff respectfully submits that Plaintiff should be awarded a percentage of Defendant's applicable sales revenue for the applicable damages period, wherein such percentage should be 6.4 percent (but in no event less than 5.73 percent) up to the date that Defendant's infringement of the patents-in-suit ends (such as in accordance with the requested permanent injunction).

212.   Plaintiff finds that any damages calculation adopted in this action should be based on the revenue generated by the Zio AT System, including all revenue generated by the Zio Service in connection with the Zio AT System.

213.   Upon information and belief, Defendant's infringement of the Letters Patent has enabled Defendant to grow its annual revenue from $147.3 million in year 2018 to $214.6 million in year 2019. *See, e.g,* Exhibit AT at page 6, ¶6. This assertion is supported by at least the following:

➢   Defendant discloses that it has two wearable biosensor models: the Zio AT and the Zio XT models. Exhibit AS at pages 4, 5 and 12.

➢   Defendant claims that it was on track to deliver 45% revenue growth in year 2019 according to information updated as of December 23, 2019. Exhibit AS at page 16.

➢   Defendant claims that the Zio AT System is driving accelerated adoption of its wearable biosensors. *See* Exhibit AS at page 12.

➢   Defendant claims to have fully launched the Zio AT System in October of 2019. *See, e.g.,* Exhibit AS at page 16.

➢   Defendant discloses that the "120 Day Volume Growth Post-Zio$^{AT}$

Launch" was more than 27% for the Zio XT model, while such growth was more than 48% for both the Zio AT and the Zio XT models combined.  Exhibit AS at page 12.

214.   Plaintiff respectfully submits that it is in compliance with 35 U.S.C. § 287.

215.   Plaintiff hereby seeks reasonable attorney fees in accordance with 35 U.S.C. § 285, and Plaintiff respectfully submits that such reasonable attorney fees are proper in this action.

## **DEMAND FOR JUDGMENT; PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

(a)  Entry of judgment that Defendant has infringed, induced others to infringe, and committed acts of contributory infringement with respect to one or more claims of the Letters Patent.

(b)  Entry of judgment for a permanent injunction under 35 U.S.C. § 283 enjoining Defendant, its officers, agents, servants, employees, and those persons in active concert or participation with Defendant, from making, using, selling, offering for sale, or importing into the United States any device or product that is found to infringe the Letters Patent, and/or committing acts that induce others to infringe, or contribute to others' infringement of, the Letters Patent.

(c)  Entry of judgment for damages adequate to compensate Plaintiff for Defendant's patent infringement, but in no event less than a reasonable royalty for Defendant's practicing of the inventions claimed in the Letters Patent, together with interest and costs under 35 U.S.C. § 284.

(d)  Entry of judgment declaring this case exceptional pursuant to 35 U.S.C. § 285, and awarding Plaintiff its reasonable attorney fees and expenses.

(e)  Such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all issues raised by the Complaint.

Respectfully submitted,

Date: <u>September 2, 2020</u>            By:    <u>/s/ Jerry A. Crandall</u>

Jerry A. Crandall (CSB No. 250192)
jac@crandalltech.com
CRANDALL TECHNOLOGIES LLC
1590 Heavenly View Trail
Reno, NV 89523
Telephone:  775.525.8777
Facsimile:   775.501.5157

*Attorney for Plaintiff*
*Crandall Technologies LLC*